IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KIMBERLY HECKSHER, | § | |
| | § | No. 621, 2014 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: |
| | § | Superior Court of the State of |
| v. | § | Delaware, in and for New Castle |
| | § | County |
| FAIRWINDS BAPTIST CHURCH, INC., | § | |
| a Delaware Corporation, and | § | C.A. No. 09C-06-236 FSS |
| FAIRWINDS CHRISTIAN SCHOOL, | § | |
| a Ministry of Fairwinds Baptist Church, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: April 22, 2015
Decided: May 21, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court. **REVERSED**.

Thomas C. Crumplar, Esquire, Raeann Warner, Esquire (*argued*), Jacobs & Crumplar, P.A., Wilmington, Delaware; Thomas S. Neuberger, Esquire, Stephen J. Neuberger, Esquire, The Neuberger Firm, P.A., Wilmington, Delaware, for Appellant.

Herbert W. Mondros, Esquire, Margolis Edelstein, Wilmington, Delaware, for Appellees.

**STRINE**, Chief Justice, for the majority:

# I. INTRODUCTION

This is an appeal from the Superior Court's grant of summary judgment for the defendants, Fairwinds Church and Fairwinds Christian School (collectively, "Fairwinds"), in an action brought by former student Kimberly Hecksher under the Child Victim's Act. The Act provides plaintiffs who claim to be victims of child sexual abuse a two-year window to bring claims that would otherwise be time-barred. Under the Act, a plaintiff may bring claims against the alleged abuser's employer for gross negligence in failing to prevent the alleged abuse.

Accordingly, Hecksher sued Fairwinds under the Act, arguing that Fairwinds, a small, religious school, was grossly negligent for failing to prevent sexual abuse by Ed Sterling ("Sterling"), her foster father and her teacher at Fairwinds, that occurred while she was a student. Hecksher alleged that Sterling's wife and fellow-Fairwinds employee, Sandy Sterling ("Sandy"), observed Sterling abusing Hecksher on school property, and that Sandy's knowledge of and tortious failure to report the abuse should be imputed to Fairwinds. Hecksher also argued that Fairwinds was grossly negligent for failing to have a sexual abuse prevention policy in place and for not responding to red flags that Sterling posed a serious risk to Fairwinds students. By granting summary judgment, the Superior Court found that there was no dispute of material fact that would enable a reasonable finder of fact to conclude that Fairwinds was grossly negligent.

We disagree. On the record presented to the Superior Court, viewed in the light most favorable to Hecksher, a reasonable juror could determine that Fairwinds was grossly negligent. Hecksher's testimony at her deposition that Sandy knew about the

1

alleged abuse and failed to report it was by itself sufficient to defeat Fairwinds' motion for summary judgment. Hecksher brought two related imputation claims to meet her burden to show that Fairwinds acted with gross negligence. First, she contended that Sandy's knowledge of the alleged abuse could be imputed to Fairwinds and thus Fairwinds' failure to act on that knowledge was grossly negligent. Second, Hecksher claimed that Fairwinds could be held vicariously liable for Sandy's grossly negligent failure to report the abuse to the authorities. Because a reasonable juror could conclude that Sandy was acting within the scope of her employment when she allegedly learned about and concealed Sterling's abuse of Hecksher, there is a basis for trial on both of Hecksher's claims.

The Superior Court erred by assuming, contrary to Sandy's own testimony, that Sandy failed to report her husband's alleged abuse out of loyalty to him, and thus, her knowledge was not within the scope of her employment. But even if Sandy had testified that she concealed the abuse solely for personal reasons, summary judgment should have been denied. We decline to absolve an employer for vicarious liability when an employer has knowingly hired family members or staff with strong personal ties to each other. For similar reasons, we refuse to expand the adverse interest doctrine to prevent the imputation of Sandy's alleged knowledge of Sterling's abuse to Fairwinds. An employer like Fairwinds has a duty to protect the students in its charge, which depends on its staff's willingness to put their duty to the school and its students first. Fairwinds' choice to hire employees with family ties is a factor it controlled and needed to consider when fulfilling its duty to protect its students against abuse. Rather than providing a safe harbor for

2

Fairwinds, its decision to hire employees with potential conflicts of interest between their duty to the students and their relationships with each other is a factor the jury must consider when evaluating whether the school acted with the required level of care.

In addition, a reasonable juror could view evidence that Fairwinds failed to implement any preventative and remedial measures to protect students from sexual abuse as a gross departure from the standard of care, given that Fairwinds had a statutory duty to report sexual abuse that could only be acted upon by its human employees. Likewise, a reasonable juror could find that Fairwinds was grossly negligent for failing to act after female students lodged complaints about Sterling's inappropriate sexual behavior and employees allegedly witnessed inappropriate contact between Sterling and Hecksher. Thus, material issues of fact remain as to whether Sandy's knowledge and conduct can be imputed to Fairwinds, and whether Fairwinds was grossly negligent for failing to have any sexual abuse prevention and detection policies in place and for failing to act on red flags that Sterling posed a serious risk to female students. Accordingly, we reverse the judgment of the Superior Court granting summary judgment to Fairwinds and remand for trial.

## II.  FACTUAL HISTORY[1]

### i.  *Fairwinds School*

While Hecksher was a student, from 1985 to 1990, Fairwinds was led by its founder, Pastor E. L. Britton, and later his son, Pastor Tim Britton. Fairwinds enrolled

---

[1] The facts are drawn from the Superior Court's order and the record presented by the parties on appeal. Consistent with the summary judgment standard, the record includes facts that could be reasonably found by a jury after a trial based on the evidence now in the record.

3

students in pre-kindergarten through high school and estimates that it employed fewer than thirty employees. The Fairwinds High School had twenty students, including nine in Hecksher's graduating class. According to Sandy, Fairwinds was a close-knit community: the students "not only were taught by these people, they went to church with these people, they went to youth groups with these people, and they felt like they were family."[2]

During the time Hecksher was a student at Fairwinds, Sterling was employed as a Math, Bible, and Spanish teacher and was Hecksher's teacher for each of those subjects. Sandy was the secretary to the principal of Fairwinds (the "Principal") from 1981 to 1989 and, as such, "the nerve center of the office."[3] Sandi Sterling ("Sterling's sister-in-law") was also employed by Fairwinds as a kindergarten teacher.

The Principal supervised all three Sterlings. According to Hecksher, the Principal was also sexually abusing a Fairwinds student during the same time period, but the Superior Court did not permit Hecksher to pursue discovery into that alleged abuse.[4]

As a religious school, Fairwinds enforced strict rules regarding the conduct of staff and students. As an example, students were forbidden from dancing and wearing

---

[2] App. to Opening Br. at 398.
[3] App. to Opening Br. at 448.
[4] Hecksher claimed to have an affidavit from an individual who stated that the Principal would "have the student . . . in his office . . . and there would be giggling coming from inside the office, and the child would leave the office with her hair disheveled." App to Opening Br. at 566. The Superior Court did not allow Hecksher to pursue discovery related to these allegations in the first phase of her discovery on the grounds that sexual abuse by the Principal, if proven, would not relate to Hecksher's claim that Fairwinds was grossly negligent for failing to prevent Sterling from abusing her. We omit the Principal's name out of respect for his privacy, because Hecksher has not named him as a defendant, nor has she proven her claim that he sexually abused a student.

suggestive clothing, and Hecksher was disciplined for "wearing her collar up."[5]  Pastor E. L. Britton and the Principal testified that Fairwinds emphasized teacher morality, and that all employees were expected to act if they saw another employee acting inappropriately, even if that employee witnessed the inappropriate conduct outside of the school.

Yet, at the time the abuse was allegedly occurring, Fairwinds did not have any written policy addressing the prevention and reporting of potential sexual abuse of students.  The record suggests that, consistent with its lack of a policy, Fairwinds did not educate its staff on their legal obligation to report sexual abuse, nor did it offer training on sexual abuse detection and prevention.  That is despite the fact that Delaware law at the time stated: "Any person, agency, organization or entity who knows or in good faith suspects child abuse or neglect shall make a report in accordance with § 904 of this title."[6]  Although this statute does not, by its terms, require any training or policies, an entity like Fairwinds could only comply with this mandate by taking reasonable measures to ensure that its human staff, *i.e.*, employees like Sandy and Sterling, understood and complied with the terms of the statute.

### ii.    Sterling's Alleged Abuse of Hecksher

In the fall of 1984, when she was 12 years old, Hecksher moved into the home of defendant Sterling and his wife, Sandy.  Hecksher's mother was a drug addict who had struggled to care for Hecksher.  She sent her daughter to stay with the Sterlings, who were family friends, because she thought that they would be "a stable Christian

---

[5] App. to Opening Br. at 131.
[6] 16 *Del. C*. § 903 (1976).

5

influence."[7]  After moving in with the Sterlings, Hecksher transferred to Fairwinds and began to attend Fairwinds Church.  Hecksher graduated from Fairwinds in 1990.

Less than a year after moving in with the Sterlings, when she was 13, Hecksher alleges that Sterling began to abuse her sexually between one and five times per week. This abuse allegedly occurred at various locations, including at the church and on school property.  According to Hecksher, if she was struggling in one of the three subjects that Sterling was teaching, he would give her extra credit in exchange for sexual favors.  The abuse by Sterling allegedly continued until Hecksher was in her early 20s, long after she graduated from Fairwinds.  In his deposition, Sterling invoked his Fifth Amendment right to refuse to answer any questions about his alleged abuse of Hecksher, and the Superior Court accordingly drew an adverse inference of guilt from his refusal to speak.[8]

### iii.    Sandy's Alleged Knowledge of the Abuse and of Her Duties To Report

Hecksher testified at her deposition that Sandy became aware of the abuse when Hecksher was in 8th grade, on the night of the school's Junior/Senior Banquet.  Although Hecksher was too young to attend the banquet, which was held for students in their junior and senior years of high school, Sterling took Hecksher as his "date," and she sat with Sterling and the other faculty members.  The Principal testified that the faculty did not find Hecksher's attendance alarming because students would sometimes bring their

---

[7] App. to Opening Br. at 131.

[8] *Hecksher v. Fairwinds Baptist Church*, 2013 WL 1561564, *1 (Del. Super. Feb. 28, 2013) [hereinafter Order] (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (noting that it is a "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause'") (internal citation omitted)).

siblings or parents as dates. When Hecksher and Sterling arrived home from the banquet, Hecksher testified that Sandy confronted them about a letter Hecksher had written to Sterling "asking him to stop molesting [her]" and stating that she "wasn't a toy doll for him to play with."[9]

Hecksher testified that Sandy observed Sterling orally raping her in Hecksher's bedroom on a separate occasion, when she was 15 or 16. Hecksher also claims that Sandy witnessed Sterling sexually abusing her on school premises. On her second day of deposition, Hecksher testified that Sandy had once walked in on Sterling fondling her in the school gymnasium, although she did not recall the incident on her first day of deposition. Hecksher was evaluated by a psychiatrist who opined that her memory of being abused in school was recovered and that Hecksher suffered from repressed memories or traumatic amnesia.

Sandy denied any knowledge of her husband's abuse in her deposition. But according to Hecksher, Sandy told Hecksher's husband, many years after the abuse had ended, that she knew about the abuse "all along" and Hecksher "got what she deserved."[10] And although Sandy testified that she was not aware of her legal duty to report known or suspected abuse, Sandy testified that she would have called the police if she had learned of her husband's abuse of Hecksher, that she had no interest in seeing it

---

[9] App. to Opening Br. at 139.
[10] App. to Opening Br. at 296-300.

occur, and that she understood that her duty "as a human being" was to contact the authorities if she learned of any abuse.[11]

    *iv.    The Fairwinds Faculty's Alleged Knowledge of the Abuse*

Hecksher testified that Sterling acted inappropriately toward her in public, such as by "tap[ping] [her] on the butt" in front of Fairwinds faculty members on multiple occasions. She claims that these occurrences, as well as the "date" night at the banquet, triggered a duty for the Fairwinds faculty to investigate their relationship.[12]

Hecksher admits that she tried to conceal the abuse from everyone she knew until long after it ended.[13] Hecksher did not tell any Fairwinds employees or members of the church that Sterling abused her, and no other witness testified to being aware of the abuse.

---

[11] App. to Opening Br. at 399.

[12] App. to Opening Br. at 285.

[13] The difficulty for a child to timely report such humiliating and sensitive events was one of the apparent purposes of the Child Victim's Act, which eliminated the statute of limitations for civil child sexual abuse cases and created a two-year window for plaintiffs to bring child sexual abuse claims for which the statute of limitations had already expired. 10 *Del. C*. § 8145. *See, e.g.*, *Wheat v. State*, 527 A.2d 269, 273 (Del. 1987) (stating that "decisions in the area of intrafamily child sexual abuse reveal [a] type[] of victim behavior which, though superficially inconsistent with the average layperson's understanding of reactions to rape, appear to be especially linked to intrafamily child rape. . . . [This] is delayed reporting of the alleged offense."); Statutes of Limitation for Civil Action for Offenses Against Children Compilation, National District Attorney Association (May 2013), *available at* http://www.ndaa.org/pdf/Statutes%20of%20Limitations%20for%20Civil%20Actions%20for%20Offenses%20Against%20Children%20(2013%20Update).pdf (citing the Delaware Child Victim's Act and explaining that "statutes of limitations have been a particularly pressing problem in light of the delicate nature of child sex crimes; victims often need many years to overcome the pain of their abuse and time to obtain the courage needed to speak out about the abuse that they have suffered.").

*v.*     *Other Alleged Student Complaints About Sterling*

Hecksher submitted evidence that there were other red flags, including complaints made to the Fairwinds faculty by students and parents, indicating that Sterling posed a serious risk to female students. On an unspecified date around 1990, student Sherrie Phillips lodged a complaint with Fairwinds that Sterling had rubbed her back inappropriately. [14] Phillips was not deposed and did not submit an affidavit, but Fairwinds addressed the incident in response to interrogatories. Sterling's sister-in-law testified in her deposition that Phillips switched schools that year "because [she] felt Mr. Sterling should be punished."[15]

Pastor Tim Britton and the Principal denied any knowledge of Phillips' complaint during their depositions, but both stated that rubbing a student's back was "tremendously inappropriate," and that a complaint of this kind would have raised a red flag.[16] And despite their professed lack of recall, Fairwinds stated in its response to interrogatories that Pastor E. L. Britton and the Principal counseled Sterling concerning the incident. Given the small size of the religious school and the concession that Sterling's behavior was "tremendously inappropriate," a reasonable juror could find that Phillips' complaint triggered a duty to take further action.[17]

Also in 1990, student Pam Arrowood and her parents informed the school that Sterling had made an inappropriate statement to Arrowood. Arrowood testified that she

---

[14] Fairwinds did not make a formal record of Phillips' complaint and the individuals who recalled the incident could not recall the exact date.
[15] App. to Opening Br. at 472.
[16] App. to Opening Br. at 464.
[17] App. to Opening Br. at 464.

9

had been alone in a classroom with Sterling, who had said, "if there were any two people left on earth that [I] could pick, it would be me and [you]."[18]  Arrowood told her parents, who were furious and called the school.  The next day, Arrowood, her parents, and Sterling met with Pastor E. L. Britton, Pastor Tim Britton, and the Principal.  Sterling claimed that it was a misunderstanding and the Fairwinds representatives took his side.  Arrowood's mother stated that if the school did not take action, she would send Arrowood to another school, but the Fairwinds representatives maintained that they would not take action against Sterling.  As a result, Arrowood switched schools that year.  Pastor Tim Britton could not remember the specific details of the incident during his deposition, but recalled that Sterling was "counseled" after the incident, although there is no record of the complaint or the school's response.[19]  Pastor Tim Britton testified that a comment like the one Sterling made to Arrowood "would have sent a red flag up" and would have been "highly offensive."[20]

In addition, Sterling's sister-in-law—also a teacher at Fairwinds—recalled that two female students had complained to her about inappropriate behavior by Sterling on separate occasions.  She testified that around 1990, Arrowood and Stephanie Donovan, another Fairwinds student in her junior year, had each informed her that Sterling had made inappropriate comments.  According to Sterling's sister-in-law, one of the students (she did not identify which) told her that Sterling had said "if there was a desert island

---

[18] App. to Opening Br. at 379.

[19] Pastor Tim Britton testified, "I do know there was just a discussion with him about, you know, be very professional, and, you know, don't get personal in the lives, you know, or about your—if you have a dream of somebody. . . ."  App. to Opening Br. at 461.

[20] App. to Opening Br. at 462.

you would be the one that I would choose to be on the island with."[21] This comment is similar to the one that Arrowood said Sterling made to her, although Arrowood testified that she did not tell anyone about the comment other than her parents. In other words, it is not clear if some form of the "island" comment was made to both Donovan and Arrowood, or just Arrowood.

The other female student (again, Sterling's sister-in-law did not identify which) reported that after she asked Sterling to use the bathroom, Sterling asked "is this a woman thing?" in front of the class.[22] Sterling's sister-in-law did not mention these incidents to anyone else in authority at Fairwinds.

### vi. Sterling's Alleged Reputation

According to Hecksher and Arrowood, Sterling's inappropriate behavior was a frequent topic of conversation among the small student body at Fairwinds, and Sterling had a reputation among students as a "creep" and a "pervert." Arrowood stated, "[t]here was lots of talk and conversation . . . and it always was about Ed Sterling. He is a pervert. All kinds of comments. The way he looked at girls. Just very uncomfortable."[23] Former Fairwinds student Stephanie Duke also submitted an affidavit stating that "Ed Sterling made me uncomfortable . . . . He stared at my chest and made comments that I smelled good. I did not want to be alone with him. In fact, if I thought I would have to be alone with him in the classroom, I asked another male student to wait for me."[24]

---

[21] App. to Opening Br. at 469.
[22] App. to Opening Br. at 469.
[23] App. to Opening Br. at 381-82.
[24] App. to Opening Br. at 103.

## III.     PROCEDURAL HISTORY

In 2007, the Child Victim's Act opened a two-year window for plaintiffs to file claims alleging that they were victims of child sexual abuse that would otherwise be time-barred.[25]  On June 24, 2009, Hecksher timely filed a complaint under the Act against Sterling, Fairwinds, and Fairwinds Church, alleging that Sterling sexually abused her over a seven-year period beginning in 1985.  The Child Victim's Act establishes gross negligence as the standard for proving an employer's liability for an employee's sexual abuse.[26]  Accordingly, Hecksher contended, among other things, that Fairwinds was grossly negligent in hiring and supervising Sterling.

On October 13, 2009, the Superior Court dismissed Hecksher's fiduciary duty claim without prejudice and allowed phased discovery on her remaining claims as it has done with other complex cases.  The Superior Court decided to phase discovery because it was concerned that allowing far-ranging discovery might inflict harm on people who were not parties to the case.  The parties were unable to agree on a form of order implementing the court's ruling, causing them to return to court on January 8, 2010 for argument on defendants' motion to stay discovery and for a protective order.  The Superior Court once again ordered a limited, structured discovery process to determine whether the school knew about the alleged abuse.  The Superior Court permitted in the first discovery phase the depositions of Hecksher, Sandy Sterling, Pam Arrowood, and two others chosen by Hecksher.

---

[25] 10 *Del. C*. § 8145(b).
[26] *Id.*

12

Hecksher was deposed on February 22, 2010, but her attorney terminated the deposition early when she became upset. Her deposition was not resumed until more than a year later, on April 25, 2011, and it concluded on December 2, 2011.

On August 14, 2011, Hecksher filed a motion to amend the scheduling order and continue the trial date. The proposed amended scheduling order implemented the three phase discovery process ordered by the Superior Court over a year and a half earlier. According to the Superior Court, Hecksher was struggling to prove her case, and she submitted the proposed order to obtain more time to shore it up. The Superior Court granted Hecksher's order in its entirety, noting that the case was "proceeding at an extraordinarily slow pace, trial in 2015, at the earliest."[27]

The amended scheduling order provided that Hecksher's discovery would proceed over three phases. In the first phase, Hecksher was permitted to develop "direct and obvious evidence" that Fairwinds was grossly negligent.[28] Specifically, Hecksher was permitted to discover evidence of what conduct occurred between Hecksher and Sterling, and what Fairwinds knew about that conduct or other inappropriate conduct between Sterling and other students.[29] Hecksher could depose six witnesses in the first phase: Sterling, Sandy Sterling, Pam Arrowood and her parents, and two Fairwinds coaches. Although Hecksher was limited in the number of depositions that she could take in the first phase, she could "follow the chain of knowledge established through this

---

[27] Order at *3.
[28] App. to Answering Br. at 656.
[29] The second phase would consist of "broadening the sweep of discovery" and "any and all standard of care issues." App. to Answering Br. at 656.

discovery."[30]  Thus, if a witness stated that she told another person about inappropriate conduct by Sterling, Hecksher could depose that person.  Hecksher could also take discovery into anything related to Sterling's termination to try to establish a pattern of inappropriate behavior with his students.

The amended scheduling order gave Hecksher six months to complete the first phase of discovery.  Hecksher commenced the first phase in December 2011, and took eight depositions over the next eight months: (i) Sterling; (ii) Sandy Sterling; (iii) Pam Arrowood; (iv) the Principal; (v) Pastor E. L. Britton; (vi) Pastor Tim Britton; (vii) Sterling's sister-in-law; and (viii) coach James Flohr.

The scheduling order provided that after the first phase, unless Hecksher sought leave of the court, discovery would be stayed and the parties would have an opportunity to file dispositive motions.  When Hecksher did not request leave of the court to take further discovery, Fairwinds moved for summary judgment on all claims.  It argued that after two years of discovery, Hecksher had no evidentiary support for her allegations that Fairwinds was aware of Sterling's alleged conduct, or that it was grossly negligent in retaining and supervising Sterling.

After briefing and oral argument, the Superior Court granted defendants' motion for summary judgment in an order dated February 28, 2013.  In the order, the Superior Court lamented the slow pace of the "almost four-year old case" and noted that despite having ample time for discovery, Hecksher was unable to present any evidence that

---

[30] App. to Answering Br. at 656.

anyone knew about the abuse other than the perpetrator, his wife, and the victim.[31] The Superior Court pointed out that Fairwinds did not ignore the student complaints, but had counseled Sterling in response.[32] The Superior Court concluded that Hecksher had failed to prove that Fairwinds was grossly negligent in supervising Sterling.[33]

Although the Superior Court assumed that Sandy was aware of the abuse for purposes of summary judgment, the court determined that Sandy's knowledge could not be imputed to her employer because she had "compelling, personal reasons for harboring her husband's misconduct and not informing the school."[34] Because "there [was] no evidence that Sandy Sterling's failure to inform on her husband was motivated by anything but loyalty to him," the Superior Court concluded that her knowledge could not be imputed to Fairwinds.[35] This appeal followed.

## IV.  ANALYSIS

### i.  *Whether the Superior Court Erred by Granting Summary Judgment*

Under the Child Victim's Act, "damages against [an employer] shall be awarded . . . only if there is . . . gross negligence on the part of the [employer]."[36] Thus, to prevail on a motion for summary judgment, Fairwinds was required to show that "there

---

[31] Order at *1.

[32] *Id.* at *2.

[33] Hecksher had also claimed that Fairwinds was grossly negligent in hiring Sterling, but the Superior Court granted summary judgment for Fairwinds on this claim because there was no evidence in the record to support it. *Id.* at *3. Hecksher does not appeal the Superior Court's decision to dismiss her negligent hiring claim.

[34] *Id.* at *4.

[35] *Id.*

[36] 10 *Del. C.* § 8145(b).

[was] no genuine issue of fact relating to the question of [gross] negligence,"[37] viewing "the evidence and all reasonable inferences taken therefrom" in the light most favorable to Hecksher.[38]

Gross negligence is an "extreme departure from the ordinary standard of care[39] that "signifies more than ordinary inadvertence or inattention."[40] An employer may be liable for grossly negligent supervision "where the employer is [grossly] negligent in giving improper or ambiguous orders or in failing to make proper regulations, or in the employment of improper persons involving risk of harm to others, or in the supervision of the employee's activity."[41] "The deciding factor is whether the employer had or should have had knowledge of the necessity to exercise control over its employee."[42]

On appeal, Hecksher claims that material issues of fact remain as to whether Sandy's knowledge and conduct can be imputed to Fairwinds, and whether Fairwinds was grossly negligent for failing to implement preventative and remedial measures and to act on red flags that Sterling posed a serious risk to female students. We review the Superior Court's decision to grant summary judgment *de novo*.[43]

---

[37] Order at \*3 (quoting *Hazel v. Del. Supermarkets, Inc.*, 953 A.2d 705, 709 (Del. 2008)).

[38] *State Farm Mut. Auto. Ins. Co. v. Davis*, 80 A.3d 628, 632 (Del. 2013) (internal citations omitted).

[39] *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 276 (Del. 2010).

[40] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

[41] Order at \*3 (quoting *Simms v. Christiana Sch. Dist.*, 2004 WL 344015, \*8 (Del. Super. Jan. 30, 2004).

[42] *Doe v. Indian River School Dist.*, 2012 WL 1980562, \*4 (Del. Super. Apr. 11, 2012) (internal quotations omitted).

[43] *See DaBaldo v. URS Energy & Const.*, 85 A.3d 73, 77 (Del. 2014).

A. <u>Whether the Superior Court Erred in Refusing to Allow a Jury to Consider Whether Sandy Sterling's Alleged Knowledge and Conduct Could Be Imputed to Fairwinds</u>

The Superior Court assumed that Sandy was aware of the alleged abuse for the purposes of summary judgment, but held that her knowledge could not be imputed to Fairwinds because Sandy was acting solely out of loyalty to her husband, and was thus not within the scope of her employment.[44] The Superior Court did not consider whether Fairwinds could be held vicariously liable for Sandy's conduct although Hecksher fairly raised that argument before the Superior Court and repeated it before this Court.[45]

On appeal, Hecksher argues that the Superior Court erred by finding that Sandy was not within the scope of her employment because she had a legal duty as a school employee to report abuse of students to the authorities, and allegedly learned about Sterling's abuse while working for Fairwinds. Hecksher further contends that the Superior Court erred by assuming that Sandy concealed the alleged abuse for personal reasons without any evidence in the record to support that conclusion. If Sandy was acting within the scope of her employment when she learned about the abuse, as Hecksher alleges, Sandy's knowledge can be imputed to Fairwinds, who could then be liable for gross negligence because it failed to act on that knowledge. In addition,

---

[44] Order at *4.

[45] *See* App. to Opening Br. at 531 ("Under Delaware Law, Wrongful Acts of Employees are Imputed to Employer."); Opening Br. at 532 ("Clearly the gross negligence of the School employees, from Pastors Britton and [the Principal] down to Sandy Sterling, was committed within the scope of their employment and must be imputed to the School."); Opening Br. at 13 ("The Superior Court Erred In Failing To Impute Fairwinds' Employee Sandy Sterling's Knowledge And Actions To Fairwinds.").

17

Fairwinds could be held vicariously liable for Sandy's tortious failure to report the alleged sexual abuse.

Fairwinds contends that the Superior Court correctly found that Sandy was not acting within the scope of her employment when she allegedly concealed the abuse because she was motivated only by personal reasons, and was not required to monitor or discipline faculty and students as part of her duties as secretary to the Principal. Fairwinds also argues that Sandy's knowledge cannot be imputed to Fairwinds under the "adverse interest doctrine" because Sandy's interest in concealing the alleged abuse was adverse to Fairwinds.

Sandy's conduct in not reporting the alleged abuse can be attributed to Fairwinds if it was committed within the scope of her employment under the doctrine of vicarious liability.[46] "The imposition of liability on the employer . . . arises . . . because the employer selected an employee who performed the employer's business negligently and caused an injury."[47] "The question of whether a tortfeasor is acting within the scope of his employment is fact-specific, and, ordinarily, is for the jury to decide."[48] In determining whether tortious conduct is within the scope of employment, Delaware courts will consider the factors outlined in the Restatement (Second) of Agency, which provides that an act is within the scope of employment if:

---

[46] *See Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 432 (Del. 1965) ("It is, of course, fundamental that an employer is liable for the torts of his employee committed while acting in the scope of his employment.") (citing the RESTATEMENT (SECOND) OF AGENCY § 219 (1958)).
[47] *Fields*, 215 A.2d at 432.
[48] *Doe v. State*, 76 A.3d 774, 776 (Del. 2013).

(1) it is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; (3) it is activated, in part at least, by a purpose to serve the master; and (4) if force is used, the use of force is not unexpectable by the master.[49]

The test to determine whether Sandy's knowledge can be imputed Fairwinds is similar, but not identical, to the test for vicarious liability. An employee's knowledge can be imputed to her employer if she becomes aware of the knowledge while she is in the scope of employment,[50] her "knowledge . . . pertain[s] to [her] duties" as an employee,[51] and she has the "authority to act" on the knowledge.[52] But, as Fairwinds points out, under the "adverse interest doctrine," an employee's knowledge will not be imputed to the employer if it arises out of the employee's wrongful conduct, undertaken solely to benefit the employee or a third party, and with no benefit to the employer.[53]

Although Hecksher's claims for the imputation of Sandy's knowledge and for vicarious liability are distinct, they require similar analysis because the same facts are

---

[49] *Id.* (quoting the RESTATEMENT (SECOND) OF AGENCY § 228 (1958)); *see also Wilson v. Joma, Inc.*, 537 A.2d 187 (Del. 1988); *Coates v. Murphy*, 270 A.2d 527 (Del. 1970); *Draper v. Olivere Paving & Const. Co.*, 181 A.2d 565 (Del. 1962).

[50] *See J.I. Kislak Mortg. Corp. of Del. v. William Matthews Builder, Inc.*, 287 A.2d 686, 689 (Del. Super. 1972), *aff'd*, 303 A.2d 648 (Del. 1973) ("Notice of an agent acquired while acting within the scope of his authority is imputable to the principal.") (citing *Nolan v. Eastern Co.*, 241 A.2d 885 (Del. Ch. 1968), *aff'd*, 249 A.2d 45 (Del. 1969)); *Vechery*, 121 A.2d at 681; *see also* 3 AM. JUR. 2d *Agency* § 255 ("Generally, the principal is chargeable with, and bound by, the knowledge of or notice to an agent received while the agent is acting within the scope of his or her authority and in reference to a matter over which such authority extends.").

[51] *Vechery v. Hartford Acc. & Indem. Ins. Co.*, 121 A.2d 681, 684 (Del. 1956) (citing 2 AM. JUR. *Agency* § 374).

[52] *Id.*; *see also* RESTATEMENT (SECOND) OF AGENCY § 275 (1958) (stating that when an employee has a duty to disclose information but fails to do so, the law assumes that the employer was aware of the information to the same extent as the employee).

[53] *See e.g.*, *Abrose v. Thomas*, 1992 WL 208478, *2 (Del. Super. Mar. 13, 1992); RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006); 3 C.J.S. *Agency* § 548 (2015) ("The [adverse interest] exception is not applicable . . . where the corporation benefits by the transaction [] and [] where the interested agent acts for the principal . . . .").

central to each claim.  Accordingly, we consider both claims together.  We find that a reasonable juror could conclude that Sandy was within the scope of her employment for purposes of either test when she allegedly learned about Sterling's alleged abuse of Hecksher and failed to report it.  Thus, a reasonable jury could find that both Sandy's knowledge of the abuse and her tortious failure to report it can be imputed to Fairwinds, for purposes of satisfying the Child Victim's Act requirement that Fairwinds acted with gross negligence.

Although the Superior Court did not analyze the first prong of the Restatement (Second) test in its decision, we believe that it is contextually important to highlight that a reasonable jury could conclude that Sandy's conduct qualified as conduct she had been "employed to perform."  This Court has clarified that "[w]rongful conduct, by definition, is not within the scope of employment in the sense that it is not conduct the employee was hired to perform.  The relevant test, however, is not whether [the wrongful act] was 'within the ordinary course of business of the [employer], . . . but whether the service itself in which the tortious act was done was within the ordinary course of such business. . . .'"[54]  Here, Sandy allegedly witnessed a teacher abusing a student on school property, and failed to report it while acting as secretary to the Principal.  As a school employee, she had a statutory duty to report sexual abuse to the authorities.[55]  And although Fairwinds did not have a sexual abuse reporting policy in place, Pastor E. L.

[54] *Doe .v. State*, 76 A.3d at 776 (quoting *Martin v. Cavalier Hotel Corp., et al.*, 48 F.3d 1343, 1351 (4th Cir. 1995)).
[55] *See* 16 *Del. C*. § 903 (1976) ("Any person, agency, organization or entity who knows or in good faith suspects child abuse or neglect shall make a report in accordance with § 904 of this title.  For purposes of this section, 'person' shall include . . . school employee[s] . . . .").

20

Britton and the Principal each testified that all Fairwinds employees were expected to report sexual abuse or suspicions of sexual abuse of students, and all employees were expected to act if they saw another employee acting inappropriately, even if that employee witnessed the inappropriate conduct outside of the school.

Accordingly, Sandy testified that although she was not aware that she had a statutory duty to contact the authorities if she suspected a student was being sexually abused by an employee, implying that Fairwinds had never informed her of her duty, she understood that it was her duty to do so, and that she would have reported any such misconduct by Sterling if she had known about it. Given Fairwinds' small size, it was important for each staff member, especially "the nerve center" of the Principal's office, to have such duties to abide by their requirement to protect the students entrusted to their care. A reasonable juror could find, viewing the facts in the light most favorable to Hecksher, that Sandy witnessed the abuse while she was working at Fairwinds, during the ordinary course of business as a Fairwinds employee; her knowledge and conduct pertained to her duties as an employee; and she had the responsibility and authority to act but did not do so. Therefore, a reasonable juror could conclude that Sandy was within the scope of employment when she allegedly learned about Sterling's abuse and failed to report it.

Fairwinds asks us to affirm the Superior Court's conclusion that Sandy acted solely for personal reasons—to protect her husband—and not to serve Fairwinds. If so, according to Fairwinds, Sandy's concealment would not be within the scope of her employment under the third prong of the Restatement (Second) test for vicarious liability,

21

the "motive requirement." Nor, says Fairwinds, could Sandy's knowledge be imputed to Fairwinds under the adverse interest doctrine. We address each of Fairwinds' related contentions in turn.

First, the evidence in the record from Sandy herself contradicts the factual premise of the Superior Court's ruling: in her sworn deposition, Sandy denied that she had a personal interest in concealing her husband's alleged abuse. During Sandy's deposition, she was asked what she would have done if she had learned about a sexual relationship between her husband and Hecksher before 1990. Sandy replied, "I would have called the police."[56] Sandy was then asked, "Because you would have no interest in seeing that occur; is that correct?" and she responded, "[c]orrect."[57] Given that Sandy's own testimony conflicts with the Superior Court's finding, the question of Sandy's motivation, which is a factual determination, should be put to the jury.[58]

Even if Sandy had been motivated, in part, to protect herself or her husband, Fairwinds could still be held vicariously liable. The motive requirement of the Restatement (Second) is broadly-worded, and provides that conduct is within the scope of employment if "it is activated, *in part* at least, by a purpose to serve the master."[59] Our cases interpreting this requirement have held that the employee need not be motivated solely by a desire to aid her employer: "[t]he mere fact that the primary motive of the

---

[56] App to Opening Br. at 404.

[57] *Id.*

[58] *Boscov's Dep't Store v. Jackson*, 2007 WL 542159, *11 (Del. Super. Feb. 12, 2007) (internal citation omitted); *see also Young v. Frase*, 702 A.2d 1234, 1237 (Del. 1997) ("It is the sole province of the jury to determine witness credibility, resolve any conflicts in the testimony and draw any inferences from the proved facts.").

[59] RESTATEMENT (SECOND) OF AGENCY § 228 (1958) (emphasis added).

22

[employee] is to benefit himself or a third person does not cause the act to be outside the scope of employment."[60]  This Court has also acknowledged the "dual purpose rule": "where the servant is combining his own business with that of his master, or attending to both at substantially the same time, no . . . inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be responsible, *unless it clearly appears that the servant could not have been directly or indirectly serving his master.*"[61]  Therefore, if a reasonable jury could conclude that Sandy acted, in part, to benefit Fairwinds, summary judgment on both of Hecksher's imputation claims should have been denied.[62]

Here, a reasonable jury could find that Sandy was at least partially motivated by a desire to protect her employer.  A jury could find, for example, that Sandy believed that Fairwinds was overall a positive institution for its students, and that a child sexual abuse scandal would have profound implications for a school of Fairwinds' size that was dependent on tuition for its survival.  A jury could find that Sandy believed that reporting Sterling's wrongful conduct would result in Fairwinds' closure, causing harm to its innocent employees—including herself—through the loss of their jobs, and to the innocent students who were served by Fairwinds.  A reasonable jury could have also believed that any scandal would damage the reputation of the Fairwinds Church and its congregation, which by all accounts were important parts of Sandy's life.

---

[60] *Wilson*, 537 A.2d at 189.

[61] *Id.* (internal quotations omitted) (emphasis added).

[62] *See Doe v. State*, 76 A.3d 774 (holding that the question of whether a police officer's rape committed while he was arresting the victim was committed solely for personal reasons could not be resolved on a motion for summary judgment).

23

But even if Sandy had stated that she was motivated by loyalty only to her husband, summary judgment on the issue of Fairwinds' vicarious liability for Sandy's concealment should have been denied. This Court has noted that an employer may be held vicariously liable for "his servant's intended tortious harm 'if the act was not unexpectable in view of the duties of the servant.'"[63] In other words, an employer may be held liable for misconduct by its employee if the employer could have foreseen that the misconduct would occur, and if it failed to take any action to prevent harm to third parties.[64] When an employer knowingly hires spouses, it has a reason to expect that those employees will have conflicted interests. Indeed, this conflict is a justification for anti-nepotism policies at many places of employment.[65] If the employer chooses to hire spouses or family members despite that risk, it has a duty to take steps to ensure that the employees will not put their personal relationships above their duty to the institution and the people that it serves.

---

[63] *Draper v. Olivere Paving & Const. Co.*, 181 A.2d 565, 569 (Del. 1962) (quoting RESTATEMENT (SECOND) OF AGENCY § 245 (1958)); *see also* RESTATEMENT (SECOND) OF AGENCY § 229 (1958) (a court should consider "whether or not the master has reason to expect that such an act will be done" when determining whether the act is within the scope of employment").

[64] *See Wilson*, 537 A.2d 187 (Del. 1988); *Screpesi v. Draper-King Cole, Inc.*, 1996 WL 769344 (Del. Super. Dec. 27, 1996).

[65] *See, e.g.*, *Montgomery v. Carr*, 101 F.2d 1117, 1130 (6th Cir. 1996) (compiling a list of justifications for an anti-nepotism policy at a school, including: "preventing one spouse from prejudging students that the other spouse had already experienced difficulties with" and "minimizing the friction caused by married teachers who have a 'you and I against the world' mentality, thereby detracting from the educational mission of the . . . school system"); Sharon Rabin-Margalioth, *Love at Work*, 13 DUKE J. GENDER L. & POL'Y 237, 239 (2006) ("Antinepotism rules often address legitimate issues, such as . . . avoiding potential conflicts of interest . . . and preventing charges of favoritism.").

This responsibility is all the more important in a school setting, where each faculty member has a legal duty to protect its students.[66] When a school hires family members, it must take steps to ensure that those employees put their duties to protect students and report sexual abuse above their personal loyalties to each other. To absolve schools from liability for the gross negligence of their employees because the school chose to hire spouses would place the harm from nepotistic hiring decisions on students and discourage the implementation of effective sexual abuse prevention policies.

For similar reasons, we reject Fairwinds' argument that Sandy's alleged knowledge of Sterling's abuse of Hecksher cannot be imputed to Fairwinds under the "adverse interest doctrine." The evident purpose of the motive requirement in the vicarious liability analysis and the adverse interest doctrine, which addresses the related topic of when an employer can be charged with an employee's knowledge, is the same: to provide a basis to permit employers to escape liability in circumstances where the employee's interests are deemed so inconsistent with that of the employer's that it would be inequitable to ascribe responsibility to the employer.[67] Just as the motive

---

[66] *See Baker v. Oliver Machinery Co.*, 1981 WL 376973, *3 (Del. Super. March 30, 1981) ("[A] school teacher has a legal duty to exercise due care to provide for the safety of his students."); *Adams v. Kline*, 239 A.2d 230 (Del. Super. 1968); *Beyers v. Capital Sch. Dist.*, No. 09C-05-0C-05-025 (Order, p. 16) (Del. Super. May 16, 2011) (schools have a "special relationship" with their students arising from the vulnerable position of students); *cf. Furek v. Univ. of Delaware*, 594 A.2d 506, 522 (Del. 1991) ("[A]lthough the University no longer stands *in loco parentis* to its students, the relationship is sufficiently close and direct to impose a duty under Restatement § 314A. The university . . . has a duty to regulate and supervise foreseeable dangerous activities occurring on its property.").

[67] *See, e.g.*, RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.").

requirement in the vicarious liability analysis has been interpreted broadly, its inverse in

the imputational analysis—the adverse interest doctrine—is intentionally narrow:

> [I]n a case where the agent's action is totally adverse to the interests of his principal, the law will not impute knowledge of the bad act to the principal, because it seems nonsensical to presume that a thieving agent would tell his principal about the theft. . . . This type of total abandonment, such as siphoning corporate funds or other outright theft, is likely to be a highly unusual case. Thus, the adverse interest exception is applied narrowly, lest it be expanded to the point of covering more terrain than the rule itself.[68]

In other words, the adverse interest doctrine may prevent a court from imputing

knowledge of wrongdoing to an employer when the employee has totally abandoned the

employer's interests, such as by stealing from it or defrauding it.[69] The adverse interest

doctrine could thus protect Fairwinds from being held liable for Sterling's knowledge of

his own abuse of Hecksher because there could be no reasonable expectation that Sterling

would fulfill his obligation to the school to report abuse that he himself committed.[70] But

---

[68] *Stewart v. Wilmington Trust SP Servs., Inc.*, 2015 WL 1396382, *24 (Del. Ch. Mar. 26, 2015) (internal citations and quotation omitted); *see also In re American Intern. Group, Inc., Consol. Derivative Litig.*, 976 A.2d 872 n.50 (Del. Ch. 2009) (internal citations and quotation omitted); *see also* 3 C.J.S. *Agency* § 548 (2015) ("The exception applies when an agent is engaged in a scheme to defraud the principal, either for the agent's own benefit or that of a third person. The knowledge of an agent is not imputed to the principal when it is clear that the agent would not communicate the fact in controversy to the principal, such as where the communication of a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating.").

[69] *See, e.g.*, Deborah A. DeMott, *When Is A Principal Charged With An Agent's Knowledge?*, 13 DUKE J. COMP. & INT'L L. 291, 309-10 (2003) ("The 'adverse interest' exception defeats imputation in a narrow range of cases involving third-party claims arising out of conduct by an agent that is so wholly antagonistic to the principal's interests that the relationship between principal and agent could be viewed as severed. In contrast, simply the fact that the agent acts with conflicted motives or interests does not trigger the adverse-interest exception to imputation.").

[70] *See, e.g.,* 2A C.J.S. *Agency* § 481 (2015) ("The presumption that the agent will fulfill the obligation to give his or her principal all knowledge relevant to the principal's protection and interest will not prevail where it is certainly to be expected that the agent will not perform this

we decline to extend the adverse interest exception to allow an employer who chooses to hire employees with conflicting loyalties to absolve itself of liability when one of those employees does not abide by her legal duty to report the sexual abuse she witnessed, allegedly because she wished to protect a co-employee.[71] The extension of the adverse interest doctrine by this means would theoretically allow employers to escape liability when close friends of abusers do not report misconduct they have witnessed, or when two staff members both engaged in abusing students know about the other's conduct, and the employer claims that their silence was a pact among fellow abusers. This would undermine a primary justification for the imputation doctrine, according to the Restatement (Third) of Agency, which states that imputing an employee's knowledge to her employer "creates strong incentives for principals to design and implement effective systems through which agents handle and report information."[72] Put simply, we decline to create degrees of consanguinity beyond the direct wrongdoing within which the adverse interest doctrine may be invoked.

---

duty as where the agent is in reality acting in his or her own or another's interest and adversely to that of the principal. In this situation, the presumption is instead that the agent will conceal any facts which might be detrimental to his or her own interests rather than disclose them.").

[71] *See e.g.*, RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006) ("A principal assumes the risk that the agents it chooses to interact on its behalf with third parties will . . . bind the principal to the legal consequences of their actions. . . . A principal also bears the risk that the incentives it creates for its agents may motivate some to act wrongfully in dealings with third parties. . . . A principal's incentive systems and other practices may [] have the effect of discouraging agents from reporting information that, after the fact, it would have been advantageous for the principal to have known.").

[72] RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. b (2006); *see also* Alan Q. Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule*, 101 HARV. L. REV. 563 (1988) (stating that vicarious liability preserves incentives for the principal to prevent wrongdoing by its agents by forcing the principal to internalize the cost of the agent's wrongdoing).

Therefore, because a reasonable juror could conclude that Sandy's failure to report abuse by Sterling, her co-worker and husband, was motivated in part by her desire to protect Fairwinds, and because any desire to protect Sterling was not an unforeseeable deviation from her duties, the Superior Court erred by granting summary judgment.[73] Thus, there is a basis for trial on both of Hecksher's claims that Sandy's knowledge and tortious conduct can be imputed to Fairwinds.

B. <u>Whether the Superior Court Erred by Finding That No Issues of Fact Existed as to Whether Fairwinds was Grossly Negligent In Supervising Sterling</u>

The Superior Court found that Hecksher failed to present any evidence that Fairwinds was grossly negligent in supervising Sterling, such as evidence that would have caused a reasonable staff member to notice that Sterling posed a risk to his students. Hecksher contends on appeal that there is sufficient evidence to support her claim, and that she would discover more if allowed to proceed to the next phase of discovery. Even if Sandy's knowledge is not imputed to Fairwinds, we agree with Hecksher that there is sufficient evidence to defeat summary judgment, including evidence that Fairwinds was grossly negligent in failing to (1) implement a sexual abuse prevention and detection policy and (2) respond to red flags that Sterling posed a risk to students.

---

[73] Although the Superior Court did not consider whether Sterling's sister-in-law's knowledge of Sterling's inappropriate behavior toward two of his female students could be imputed to Fairwinds, the same principles of agency law that apply to Sterling's wife apply to his sister-in-law. As such, the jury could impute Sterling's sister-in-law's knowledge to Fairwinds if it found that her failure to report the comments was within the scope of her employment. The fact that Sterling's sister-in-law is a relative of Sterling's does not prevent Hecksher from putting this claim before the jury.

*(1) Alleged Lack of Any Sexual Abuse Detection and Prevention Policies*

Under the Restatement (Second) of Torts, employers have a duty to control their employees to protect against an unreasonable risk of harm to others.[74] This obligation is heightened in a school setting, where the staff assumes responsibility for its students' safety.[75] Thus, Fairwinds had a duty to exercise due care to protect its students.

Yet Fairwinds did not have any official policy or rules about sexual abuse prevention, detection, or reporting. And although both Fairwinds as an institution and its employees had a duty under Delaware law to report known or suspected abuse to the authorities,[76] and Fairwinds could obviously not comply with its duty unless its human employees complied with theirs, Sandy testified that she was not aware of this requirement, nor were Fairwinds employees trained on how to detect or prevent sexual abuse.

Therefore, a reasonable juror could conclude that Fairwinds' failure to take *any* steps to inform its staff of their statutory obligation to report sexual abuse of students and train them on how to detect and prevent such abuse was an extreme departure from the required standard of care. Efforts of this kind were all the more important in a setting where many members of the staff had conflicts of interest that could cause them to put

---

[74] RESTATEMENT (SECOND) OF TORTS § 317 (1965).

[75] *See Baker*, 1981 WL 376973 at *3; *Beyers v. Capital Sch. Dist.*, No. 09C-05-0C-05-025; *e.g.*, *Furek*, 594 A.2d at 522; *Rogers v. Christina School Dist.*, 73 A.3d 1, 11 (Del. 2013) ("Section 314A of the Restatement [(Second) of Torts] attaches a legal duty to parties when they assume custody of another . . . . Specifically, Section 314A explains that certain situations can give rise to special relationship imposing a duty to aid or protect another. As subsection (4) illustrates, '[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.'") (internal citation omitted).

[76] *See* 16 *Del. C*. § 903 (1976).

29

the interests of their family members or the Church above those of students. Had Fairwinds taken *any* reasonable steps to train its employees on sexual abuse reporting and prevention, there is evidence in the record supporting an inference that its employees, including Sterling's sister-in-law and his wife, would have realized that Sterling posed a risk to his students, and reported his behavior to the school or the authorities.

*(2)     Alleged Failure to Respond to Signs that Sterling Posed a Serious Risk to Female Students*

Even if Fairwinds' alleged failure to implement any preventative and remedial measures was not grossly negligent by itself, there is also evidence that would permit a reasonable juror to conclude that Fairwinds' failure to react to danger signs, including complaints by students and parents about disturbing behavior by Sterling, was grossly negligent. Those signs included: (i) two formal complaints by students about Sterling's inappropriate behavior, which were not acted upon and which caused both students to leave the school; (ii) evidence that Sterling acted inappropriately toward Hecksher in front of the faculty; (iii) evidence that Sterling took Hecksher as his "date" to a school event; and (iv) evidence that Sterling had a reputation of being a "creep" and made female students at Fairwinds uncomfortable.

A jury could find this evidence all the more telling because Fairwinds was a very small religious school, and the few faculty members spent a great deal of time with the students. Because of Fairwinds' small size, and the closeness of the community, a reasonable jury could find it difficult to believe that the other members of the faculty were unaware of Sterling's reputation. Moreover, the school enforced strict rules,

30

prohibiting students from dancing and wearing revealing clothing. Accordingly, as Pastor Tim Britton and the Principal testified, a complaint that a teacher touched a student inappropriately would have raised a red flag, and would have been considered "tremendously inappropriate."[77]

A reasonable jury could also find important the vulnerable nature of Hecksher's position, of which Fairwinds was aware. She came from a broken home and was completely dependent on her foster parents. Her foster father, Sterling, was also her teacher in three subjects for all three years that she attended Fairwinds. If the school was indeed aware of Sterling's reputation, as we must assume on a motion for summary judgment, a reasonable jury could conclude that Sterling's close relationship with his foster daughter raised a red flag to the members of the faculty and triggered a duty to act to ensure Hecksher's safety.[78]

Fairwinds had a duty to protect its students, including Hecksher, and a reasonable jury could conclude that Fairwinds failed to do so when it did not take any discernable steps to respond to multiple incidents that suggested that Sterling posed a danger to female students. Aside from possible informal counseling of Sterling, Fairwinds did not take any steps to monitor Sterling's contact with female students, investigate whether his

---

[77] App. to Opening Br. at 464.

[78] Although the parties have not dilated on this point, we are aware that many of the red flags that should have alerted Fairwinds to monitor or discipline Sterling occurred at the end of Hecksher's time at Fairwinds, during her junior and senior years. But that does not mean that summary judgment against her was appropriate. The record shows that Sterling continued to abuse Hecksher by taking advantage of his parental status until she was in her early 20s. A reasonable argument can be made that if Fairwinds acted on red flags late in Hecksher's high school education, Sterling's pattern of abuse would have been broken and Hecksher would not have suffered many more years of abuse.

31

conduct toward Arrowood and Phillips might signal a deeper issue, or take any more substantial preventive or disciplinary action.

ii.      *Whether the Superior Court Abused its Discretion When it Denied Hecksher's Motion to Amend Her Complaint and Limited Hecksher's Discovery*

Hecksher raises two other issues on appeal. First, Hecksher claims that the Superior Court erred by staging the discovery she could take. We do not believe that the Superior Court abused its broad discretion in this regard,[79] and in any event, we have now remanded for a trial and Hecksher is free, by the terms of the Superior Court's own order, to complete fuller discovery to prepare her case for trial. We do make two observations about this claim, however. Given the Superior Court's restriction of the discovery that Hecksher could take, it was critical to accord her the favorable factual inferences from the record that are always required when considering a motion for summary judgment.[80] Even more important, the Superior Court must now re-address Hecksher's application to inquire into whether the Principal was also engaging in sexually inappropriate conduct with students at the time Sterling was allegedly abusing Hecksher. That conduct bears on the question of whether Fairwinds had breached its duties to Hecksher, and also the truthfulness of the Principal's testimony that he was unaware of Sterling's abuse of Hecksher and that he would have acted to protect Hecksher had he known.

---

[79] *See Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, *4 (Del. Oct. 1, 2014) (noting that this Court reviews a trial court's pre-trial discovery rulings for abuse of discretion).
[80] *See Davis*, 80 A.3d at 632 (Del. 2013).

Second, the Superior Court implicitly denied, without explanation, a motion by Hecksher to amend her complaint to add a claim based on a simple negligence theory. Generally, a trial court must "exercise its discretion in favor of granting leave to amend" when there is no prejudice to the non-moving party.[81] Although there is no doubt that Hecksher pressed her claim in an less-than-speedy manner, the basis on which this motion was denied is unclear to us, and it is not obvious that Fairwinds would have been prejudiced if Hecksher's motion had been granted. At the time Hecksher made the motion, discovery had not yet been completed due to the Superior Court's decision to structure it in three phases. In addition, the Superior Court had other means available to protect Fairwinds against prejudice, such as preventing Hecksher from taking repetitive depositions or requiring her to pay the costs of any duplicative discovery. Without any explanation for why the motion was denied, we cannot determine whether the Superior Court abused its discretion. Because the case will now proceed to a new phase of discovery, Hecksher may renew her motion to amend so that the Superior Court may consider it again on a clean slate based on input from the parties and this opinion.

## V.     CONCLUSION

For the foregoing reasons, we reverse the judgment of the Superior Court granting summary judgment to Fairwinds. We remand so that a jury can consider whether Sandy's knowledge of the alleged abuse and her failure to report it can be imputed to Fairwinds, and whether Fairwinds was grossly negligent for failing to have a sexual

---

[81] *Mullen v. Alarmguard of Delmarva, Inc.*, 625 A.2d 258, 263 (Del. 1993).

abuse prevention policy and not acting on red flags that Sterling posed a danger to female

students.

**VAUGHN**, Justice, dissenting:

I believe the Majority misconstrues the Child Victim's Act (the "Act") by concluding that Fairwinds is subject to indirect liability through imputation of Sandy Sterling's ("Sandy") knowledge,[82] and through vicarious liability based on Sandy's failure to report Hecksher's abuse.[83] Under the Majority's view, a school is subject to potential liability for a teacher's sexual abuse of a student in a suit brought under the Act if there is testimony that decades ago one teacher, in addition to the abuser, was aware of the abuse and failed to report it. I find it difficult to harmonize such a result with the express language of the Act, which requires that damages against an employer "be awarded . . . *only if there is a finding of gross negligence on the part of the entity*."[84]

---

[82] Restatement (Third) of Agency Section 5.03 (2006) provides:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent
> > (a) acts adversely to the principal as stated in § 5.04, or
> > (b) is subject to a duty to another not to disclose the fact to the principal.

The rationale for this rule rests on the idea that the principal has the ability to monitor the agent and to create incentives for properly handling information. *See* Restatement (Third) of Agency § 5.04, cmt. b (2006) ("A principal's right to control an agent enables the principal to consider whether and how best to monitor agents to ensure compliance with these duties. A principal may not rebut the imputation of an agent's notice of a fact by establishing that the agent kept silent.").

[83] "The force of the imputation doctrine and its limited adverse interest exception are bolstered by an equally well-entrenched doctrine of agency law: the doctrine of *respondeat superior* . . . . The exception to *respondeat superior* is similar to the adverse interest exception to imputation, although phrased somewhat differently: if the agent acted outside of the scope of employment and intended to further no interest of the principal, the principal is not liable for the agent's actions." *See* Mark J. Loewenstein, *Imputation, The Adverse Interest Exception, and the Curious Case of The Restatement (Third) of Agency*, 84 U. COLO. L. REV. 305, 309-10 (2013).

[84] 10 *Del. C.* § 8145(b) (emphasis added).

35

Vicarious liability is an employer's strict liability for the negligence of an employee.[85] It does not involve a finding of negligence on the part of the employer at all.[86] Allowing recovery of damages based on principles of *respondeat superior* and imputation in cases where a third-party teacher gains knowledge of another teacher's sexual abuse of a student runs counter to the express language of the Act,[87] as liability would attach even though the entity was not grossly negligent in supervising the teacher's conduct and had no opportunity to take action to end the abuse. For these reasons, and the other reasons set forth herein, I dissent.

My view of the statute is that because damages can be awarded against an employer only if "there is a finding of gross negligence on the part of the entity," a plaintiff must prove direct liability.[88] In the case of a school, direct liability would be

---

[85] *See* Restatement (Second) of Agency §§ 219 and 229 (1958) (providing that an employer is liable for an employee's acts done within the scope of employment); *Fisher v. Townsends, Inc.*, 695 A.2d 53, 58 (Del. 1997) ("[I]f the principal is the master of an agent who is a servant, the fault of the agent, if acting within the scope of employment, will be imputed to the principal by the doctrine of *respondeat superior*."); *Greco v. Univ. of Delaware*, 619 A.2d 900, 903 (Del. 1993) ("[W]here the alleged basis for the liability of an employer is the negligence of an employee, the employer cannot be held liable unless the employee is shown to be liable." Hence, generally, if absence of culpability on the part of the employee to the injured person has been established by litigation, the employer cannot be held liable to the injured person.") (internal citations and quotations omitted); *see also* *J.I. Kislak Mtg. Corp. v. William Mathews Bldr., Inc.,* 287 A.2d 686, 689 (Del. Super. 1972), *aff'd,* 303 A.2d 648 (Del. 1973) ("Notice of an agent acquired while acting within the scope of his authority is imputable to the principal.") (internal citations omitted).

[86] Restatement (Second) of Agency § 219 (1958).

[87] *Zhurbin v. State*, 104 A.3d 108, 110 (Del. 2014) ("Where a statute contains unambiguous language that clearly reflects the intent of the legislature, then the language of the statute controls.") (internal quotations omitted).

[88] *See Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1257 (Del. 2011) ("The General Assembly, in Section 8145, made a policy decision to set gross negligence as the floor. . . for invoking the statute's applicability.").

proof of gross negligence on the part of a principal, vice-principal, or other management or supervisory official.[89]  From this, I conclude that what Sandy and Sterling's sister-in-law knew and did not report is not relevant.

As to the remaining evidence, I agree with the Superior Court that it is insufficient as a matter of law to sustain a jury finding of gross negligence on the part of Fairwinds.[90]  Gross negligence is an "extreme departure from the ordinary standard of care"[91] that "signifies more than ordinary inadvertence or inattention."[92] "It implies a lack of care involving a conscious indifference to consequences in circumstances where probability of harm to another is reasonably apparent," [93] an "'I-don't-care-a-bit-what happens' attitude." [94]  The Majority concludes that a reasonable jury could determine that Fairwinds' inaction satisfies this high standard.  I disagree.

Hecksher argues that Fairwinds was grossly negligent in failing to implement an abuse and prevention policy and failing to provide training to its staff on recognizing and reporting sexual abuse, as well as by ignoring several "red flags," which included: (1)

---

[89] *See Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 722 (3d Cir. 1989).

[90] *See Cohen v. Kids Peace Nat. Centers, Inc.,* 256 Fed. Appx. 490, 492 (3d Cir. 2007) ("Gross negligence is generally a question of fact for the jury to decide.  However, a court may decide the issue as a matter of law where the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence.") (internal citations and quotations omitted).

[91] *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 276 (Del. 2010).

[92] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

[93] *Parker v. Wireman*, 2012 WL 1536934, at * 3 (Del. Super. Apr. 30, 2012) (internal quotations omitted).

[94] *Id.* (quoting *McHugh v. Brown,* 125 A.2d 583, 586 (Del. 1956)); *see also* Black's Law Dictionary (2014) (defining "gross negligence" as: "A lack of even slight diligence or care . . . . The difference between *gross negligence* and *ordinary negligence* is one of degree and not of quality. Gross negligence is traditionally said to be the omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property.").

two formal complaints—one made by a female student and the other by the parents of a female student—alleging Sterling had acted inappropriately; (2) Sterling's tapping Hecksher on the butt in the presence of the school's faculty; (3) evidence that Sterling took Hecksher as his "date" to a school event;[95] and (4) evidence that Sterling had a reputation of being a "creep."

First, I do not believe Fairwinds' failure to implement a sexual abuse prevention policy equates to an "I-don't-care-a-bit-what happens' attitude."[96] While it is true that the staff of Fairwinds had a statutory duty to report sexual abuse,[97] it does not follow that Fairwinds should be found grossly negligent merely because one staff member breached that duty without the administration's knowledge.[98] To hold otherwise undermines the particularly demanding matter of proof set forth by the Legislature in the Child's Victim Act.[99] Moreover, Fairwinds had no statutory duty to implement a policy, and the record reveals no obstacle that prevented Sandy, Sterling's sister-in-law, or any other member of

---

[95] Sandy testified that Sterling took Hecksher to the Junior/Senior Banquet because Hecksher wanted to go and Sandy had no interest in going. Hecksher was 15 years old at the time of the banquet. Appellant's Op. Br. App. at 399-400.

[96] Restatement (Second) of Torts § 317 provides that employers have a duty to control their employees, even when they act outside the scope of their employment, to protect against an unreasonable risk of harm to others only when the employer knows, or has reason to know, of the necessity for such control. In this case, Hecksher put forth sufficient evidence to show that Sandy was aware that Sterling was sexually abusing her, but failed to show that any Fairwinds' official knew, or had reason to know of the abuse.

[97] *See* 16 *Del. C.* § 903 (1976).

[98] As noted in the Majority Opinion, Sandy testified that she was unaware of her statutory duty to report sexual abuse, but that if she had known Hecksher was being sexually abused by Sterling, she would have called the police. Appellant's Op. Br. App. at A404.

[99] 10 *Del. C.* § 8145(b) ("[D]amages against the legal entity shall be awarded . . . only if there is a finding of gross negligence *on the part of the legal entity*.") (emphasis added).

the staff, from informing Fairwinds' administration of inappropriate behavior on the part of Sterling.

For similar reasons, I do not believe that Hecksher's evidence creates a genuine issue of fact as to whether Fairwinds was grossly negligent in failing to provide training to its staff on how to recognize and report signs of sexual abuse. It is undisputed that Fairwinds was unaware of Sterling's abuse of Hecksher, and the majority of "red flags" relied upon by the Appellant occurred in her last two years at Fairwinds.[100] Hecksher's other evidence is far too attenuated from her circumstances to show that sexual abuse was a legitimate concern of the school at the time that required Fairwinds institute training to its staff. During the time Hecksher attended Fairwinds, the school did not know, and could not have reasonably known, of Hecksher's sexual abuse. Nor does the record reveal that any Fairwinds' teacher had been subject to prior allegations of sexual abuse. Under the circumstances presented in the this case, the absence of evidence of prior sexual abuse by Sterling or other teachers, coupled with the disciplinary actions Fairwinds took against Sterling based on the improper conduct of which it was aware, lead me to conclude that no reasonable juror could find Fairwinds grossly negligent in failing to implement a sexual abuse training program.

As to the "red flags" themselves, I do not find the evidence offered by Hecksher adequate to survive summary judgment under a gross negligence standard. This is not a

---

[100] *See Kline ex. rel. Arndt v. Mansfield*, 255 Fed. Appx. 624, 630 (3d. Cir. 2007) ("[Plaintiff's] reliance on instances of possible sexual abuse that were unknown to [school district] is also misplaced. Because this evidence was unknown, the failure to train school officials could not be perceived as a conscious or deliberate choice on [school district's] part.").

case in which there were multiple complaints of sexual abuse made to, and ignored by, Fairwinds' administration.[101] Hecksher concedes that she did not complain to any school official about Sterling's misconduct. Instead, she bases her claim on the knowledge that school officials possessed regarding certain contacts Sterling had with her, and Sterling's alleged inappropriate conduct toward two other students in unrelated incidents that took place in or about 1990, Hecksher's last year at Fairwinds.[102]

The record makes clear, however, that no Fairwinds official possessed actual knowledge of the inappropriate sexual nature of Sterling's relationship with Hecksher. In fact, the only improper physical contact between Hecksher and Sterling alleged to have been witnessed by the Fairwinds staff was his "tap[ping] [her] on the butt" in front of "[a]ll of the faculty."[103] I do not find this evidence sufficient for a jury to determine that Fairwinds officials should have been aware that Sterling was sexually abusing Hecksher and thus consciously disregarded the obvious consequences of its inaction.

As to the two formal complaints against Sterling, each involved different students and unrelated incidents, and neither provided Fairwinds officials with any evidence that Sterling may have been sexually abusing Hecksher. The first complaint stemmed from an inappropriate comment made by Sterling to a female student,[104] and the second

---

[101] *See, e.g.*, *Stoneking*, 882 F.2d at 725-26 (denying defendant school officials' motion for summary judgment based, in part, on the fact that they had received at least five complaints about sexual assaults on female students by teachers and staff members); *C.M. v. Southeast Delco Sch. Dist.,* 828 F. Supp. 1179, 1185 (E.D. Pa. 1993) (denying summary judgment "in light of [repeated complaints and] what defendants allegedly knew about [teacher's] conduct").

[102] Appellant's Op. Br. App. at A147.

[103] Appellant's Op. Br. App. at A285.

[104] Appellant's Op. Br. App. at A147.

resulted from Sterling's inappropriate rubbing of another female student's back.[105] Sterling was counseled by the school after each incident, and both complaints are plainly insufficient to alert Fairwinds to the possibility that Sterling was sexually abusing his step-daughter,[106] who was not involved in either event.

Similarly, the fact that Sterling had a reputation as being "creepy" and took his step-daughter as a "date" to a school function is not sufficient evidence to create a genuine issue of material fact that Fairwinds was somehow indifferent in discovering his sexual abuse of Hecksher.

My reading of the Child Victim's Act leads me to the conclusion that a plaintiff must offer direct evidence that an entity was grossly negligent to survive a motion for summary judgment. While I do not question the fact that "a student suffers extraordinary harm when subjected to sexual abuse by a teacher, and that [the] conduct is reprehensible and undermines the basic purposes of the educational system,"[107] the question on appeal is whether a third-party teacher's knowledge of a student's sexual abuse is attributable to a school that employs her despite its having no independent knowledge of the abuse. I believe that pursuant to the express language of the Act, this question should be answered in the negative.

---

[105] Appellant's Op. Br. App. at A147.

[106] *See Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 279 (1989) (finding that in a Title IX action, a principal's knowledge of a teacher's inappropriate comment was insufficient to show that the school was deliberately indifferent in discovering teacher's sexual relationship with student).

[107] *Id.* at 292.

I also find the other evidence offered by Hecksher to be insufficient to create a genuine issue of material fact as to whether Fairwinds was grossly negligent in supervising Sterling.  No reasonable juror could determine otherwise.  For all of these reasons, I respectfully dissent.