# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSE MELLADO, D.M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0791-BWD |
| | ) | |
| ACPDO PARENT INC., | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL FINAL REPORT

Final Report: November 21, 2023
Date Submitted: November 20, 2023

Steven L. Caponi and Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; OF COUNSEL: Thomas A. Warns, K&L GATES LLP, New York, New York, *Attorneys for Plaintiff Jose Mellado, D.M.D.*

Richard Rollo, Travis S. Hunter, John O'Toole, and Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendant ACPDO Parent Inc.*

**DAVID, M.**

Plaintiff Jose Mellado, D.M.D. ("Plaintiff"), a director of ACPDO Parent Inc. ("ACPDO Parent" or the "Company"), brings this action pursuant to the Company's bylaws and 8 *Del. C.* § 220(d) seeking inspection of thirteen categories of books and records, primarily consisting of informal communications between or among the Company's directors and officers. The Company is a Delaware corporation that serves as a holding company for a subsidiary that provides management services to dental practices in Miami-Dade County, Florida, founded by Plaintiff and his wife, Dr. Ania Cabrerizo. The Company asserts that Plaintiff and Dr. Cabrerizo, who were terminated from their positions at the management company and the dental practices in 2022, seek books and records for improper purposes—namely, regaining control of the dental practices they founded by assisting the Florida Agency for Healthcare Administration in its ongoing investigation into Medicaid fraud at the Company, and furthering pending litigations in Florida and Delaware courts.

In discovery, Plaintiff withheld documents and refused to answer questions about the Florida Agency for Healthcare Administration's investigation. As a remedy, I recommend shifting the burden of proof from the Company to Plaintiff to demonstrate by a preponderance of the evidence that Plaintiff's primary purpose for the demand is not improper.

Applying that burden shift, I find that Plaintiff has met his burden to prove that his primary purpose for making the demand is reasonably related to his position

as a director of the Company, although Plaintiff also has other, secondary purposes for seeking books and records. I recommend entry of an order compelling the production of certain materials that other directors receive, but denying Plaintiff's broad, discovery-like requests for informal director and officer communications.

This is a final report.

## I. BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pre-trial order and the evidence presented at trial, including the live testimony of one witness, the deposition testimony of two witnesses submitted in lieu of live testimony at trial, and the parties' joint trial exhibits.[1]

### A. Plaintiff And Dr. Cabrerizo Expand Their Dental Practices With An Investment From Boyne.

Plaintiff and his wife, Dr. Ania Cabrerizo, are pediatric dentists.[2] Prior to February 2020, Plaintiff and Dr. Cabrerizo operated three dental practices in Miami-Dade County, Florida (the "Dental Practices").[3] The Dental Practices treated

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Trial testimony is cited as "Tr. at __". The deposition testimony of Plaintiff, Dr. Cabrerizo, and Patrick Haiz is cited as "Pl. Dep. at __", "Cabrerizo Dep. at __", and "Haiz Dep. at __", respectively. The joint trial exhibits are cited as "JX __".

[2] Tr. at 5:4-21.

[3] The Dental Practices are comprised of AC Ortho PLLC and Ania Cabrerizo, D.M.D., P.A.

patients from underserved communities, most of whom depended on Medicaid for access to treatment.[4]

In February 2020, Plaintiff and Dr. Cabrerizo entered into a transaction with private equity firm Boyne Capital Management, LLC ("Boyne") to expand the Dental Practices (the "Transaction").[5] The Transaction was structured to navigate— comply with or circumvent—a Florida law that prohibits a "non-dentist" from influencing or otherwise interfering with the exercise of a dentist's independent professional judgment.[6] The resulting structure was as follows: (1) non-dentist stakeholders, including Boyne, would own stock in ACPDO Parent, a Delaware corporation; (2) ACPDO Parent would indirectly own another Delaware corporation, ACPDO Management, Inc. ("ACPDO Management"), that would provide management services to the Dental Practices pursuant to a Management Services Agreement; and (3) the Dental Practices would remain wholly owned by Plaintiff

---

[4] Tr. at 6:1-13.

[5] PTO ¶ 6.

[6] Title XXXII, Chapter 466, Section 0285 of the Florida Statutes provides, in part, that "(1) No person other than a dentist licensed pursuant to this chapter, nor any entity other than a professional corporation or limited liability company composed of dentists, may: (a) Employ a dentist or dental hygienist in the operation of a dental office[;] (b) Control the use of any dental equipment or material while such equipment or material is being used for the provision of dental services, whether those services are provided by a dentist, a dental hygienist, or a dental assistant[;] [or] (c) Direct, control, or interfere with a dentist's clinical judgment."

and Dr. Cabrerizo, who are licensed dentists.[7] The following graphic illustrates that organizational structure:



In connection with the Transaction, the parties entered into a Stockholders Agreement, which entitles Boyne to designate three "Investor Directors" to the Company's board of directors (the "Board") and Plaintiff and Dr. Cabrerizo to designate two "Founder Directors" to the Board.[8]

Prior to June 2023, the Board consisted of two Founder Directors—Plaintiff and Dr. Cabrerizo—and two Investor Directors—Boyne's CEO and Managing Partner, Derek McDowell, and Boyne's CFO, Adam Herman.[9] In June 2023, Boyne filled the third Investor Director seat by appointing Patrick Haiz to the Board.[10]

---

[7] PTO ¶ 7.

[8] JX 15 § 2.1.

[9] PTO ¶ 2.

[10] JX 105.

McDowell currently serves as the Company's President, CEO, and Secretary, and Herman serves as Vice President.[11]  Prior to April 28, 2022, Plaintiff served as the CEO of ACPDO Management.[12]

### B. Plaintiff Raises Concerns That ACPDO Management Is Illegally Interfering With The Dental Practices' Operations.

Plaintiff contends that for the first 18 months following the Transaction, the Dental Practices operated and performed well; shortly thereafter, however, Boyne instated a management team at ACPDO Management who, despite not being dentists, began to interfere with the day-to-day operations of the Dental Practices, in violation of Florida law.[13]  In January 2022, Plaintiff raised concerns that Boyne's decision to implement "CareStack," a cloud dental practice management software, at the Dental Practices did "not fulfill" the Dental Practices' "clinical needs."[14]

---

[11] Tr. at 232:24; 233:1-3.

[12] *Id*. at 108:20-23.

[13] Compl. ¶¶ 26-27.

[14] JX 39.  The Company objects to portions of JX 39—a January 7, 2022 email from Plaintiff that was circulated among Herman, McDowell, and two other Boyne emails—as inadmissible hearsay.  Lower portions of the email chain are not hearsay.  *See* D.R.E 801(d)(2)(D).

### C. Plaintiff and Dr. Cabrerizo Are Terminated And File Suit In Florida State Court.

On April 28, 2022, ACPDO Management purported to terminate Plaintiff from his position as CEO of that entity.[15] Plaintiff alleges that on May 6, 2022, ACPDO Management informed him that due to purported breaches of the Management Services Agreement, Plaintiff's and Dr. Cabrerizo's shares in the Dental Practices had been transferred to a "Designated Transferee," Dr. Howard Fetner.[16] On May 12, 2022, Dr. Fetner, as the new "President and Owner" of the Dental Practices, purported to terminate Dr. Cabrerizo from her position as clinical director for the Dental Practices.[17]

Plaintiff and Dr. Cabrerizo remain directors of the Company; however, Plaintiff contends that since their termination, they have not received notice of all Board meetings or adequate information about the Company's business or the Dental Practices' operations.[18] The Company denies that characterization, claiming Plaintiff was invited to attend Board meetings and calls throughout 2022 and 2023.[19]

---

[15] PTO ¶ 8.

[16] JX 60 ¶ 78.

[17] PTO ¶ 8; JX 60 ¶ 93.

[18] Tr. at 64:10-17.

[19] *See* JX 59; JX 94; JX 120; JX 131.

In July 2022, Plaintiff and Dr. Cabrerizo initiated a lawsuit in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida against ACPDO Management, Boyne, McDowell, Herman, and Dr. Fetner under the caption *Mellado v. ACPDO Management, Inc.*, Case No. 22-013308-CA-44 (Fla. 11th Cir. Ct. July 19, 2022) (the "Florida Action").[20]  In the Florida Action, Plaintiff and Dr. Cabrerizo "seek[] damages, declaratory relief, and injunctive relief related to breaches of multiple contracts by ACPDO [Management] as well as ACPDO[] [Management's] wrongful termination of [Plaintiff], the wrongful termination of Dr. Cabrerizo, and the intentional interference with those contractual relationships by Boyne Capital, McDowell, and Herman."[21]  Among other relief, Plaintiff and Dr. Cabrerizo seek the return of their shares in the Dental Practices.[22]

Both Plaintiff and Dr. Cabrerizo testified that at the time the Florida Action was filed, their intention was to seek to regain control of the Dental Practices.[23] Plaintiff further testified, however, that the practices may no longer be "salvageable" given recent developments with the business.[24]

---

[20] JX 60.

[21] *Id.* ¶ 1.

[22] *Id.* at 26-27.

[23] Tr. at 180:2-10; 298:17-299:5.

[24] *Id.* at 267:22-286:14.

7

**D.** **The Florida Agency For Healthcare Administration Investigates Fraudulent Medicaid Billing Practices At ACPDO Management.**

In September 2022, the Florida Agency for Healthcare Administration ("AHCA") initiated an investigation into fraudulent Medicaid billing practices at ACPDO Management and the Dental Practices. The parties dispute the details of the investigation, but generally speaking, the investigation concerns (1) Medicaid claims that were improperly submitted under Dr. Cabrerizo's individual "National Provider Identifier" after she was terminated from the Dental Practices, and (2) possible overuse of a "behavioral management code" that resulted in additional charges for claims involving young children who supposedly misbehaved during their office visits.[25]

AHCA's investigation led to the arrest of five employees in April 2023, but criminal charges were not pursued.[26] AHCA did, however, place ACPDO Management and the Dental Practices on a "payment hold," preventing certain payments from insurance providers that have contracts with AHCA.[27] The payment holds implemented as a result of the investigation have resulted in a significant decline in revenue for the Dental Practices. AHCA's investigation remains ongoing,

---

[25] *Id.* at 39:10-17.

[26] PTO ¶ 18.

[27] JX 84 at 2-5.

and it is unclear whether additional sanctions or measures will be implemented against the Company.

### E. A Restructuring Committee Proposes A Capital Raise To Pay Legal Expenses For ACPDO Management Employees Incurred During The Investigation.

On April 19, 2023, McDowell and Herman held a meeting of the Board for which Plaintiff and Dr. Cabrerizo were not given notice.[28] At that meeting, McDowell and Herman resolved to establish a "Restructuring Committee," consisting of themselves, "to negotiate, consider, review, evaluate, and make recommendations to the Board relating to certain strategic and/or financial alternatives available to" the Company and its subsidiaries, "including, without limitation, a financing, refinancing, restructuring, recapitalization, merger, consolidation, sale, reorganization, liquidation or an amendment or modification to the credit facilities of" the Company or its subsidiaries.[29]

On May 11, 2023, the Restructuring Committee held a meeting to consider the Company's "liquidity while AHCA lifts the Medicaid payment suspension," the

---

[28] JX 69.

[29] *Id.*; JX 71, Ex. A at 1. Under the Bylaws, if only two Investor Directors are appointed, they may vote as three directors. *See* JX 1 § 3.9 ("[I]f, at the applicable time, the Board is comprised of five (5) directors and Investor is entitled to elect three (3) Investor Directors but Investor has only elected two (2) Investor Directors, then the two (2) elected Investor Directors shall each have thirty (30%) of the voting power of the Board.").

potential engagement of a restructuring firm, and options "to support the Company with additional liquidity to fund working capital and investigation-related defense costs for ACPDO employees."[30]  On June 1, 2023, the Restructuring Committee "decided that it would be in the Company's best interest to issue [a] new equity issuance at $0.39 per share" and determined to "advise the Board on its determination of liquidity needs and equity fundraise process."[31]

On June 5, 2023, Plaintiff and Dr. Cabrerizo received notice that a special meeting of the Board had been scheduled for June 7, 2023.[32]  At 9:48 p.m. the night before the meeting, Plaintiff and Dr. Cabrerizo learned of the Restructuring Committee for the first time, when McDowell distributed materials to the directors that included a cash flow forecast, equity valuation documents, and minutes of the Restructuring Committee's June 1, 2023 meeting.[33]  At 9:52 p.m., McDowell informed the Board that the purpose of the special meeting was to "[r]eview Restructuring Committee Recommendations regarding [the] Company's liquidity

---

[30] JX 77.

[31] JX 85.

[32] JX 87.

[33] JX 89; JX 91.

needs and assessment of the Company's fair market value for purposes of exploring an additional capital raise."[34]

On June 7, 2023, the Board held the special meeting, during which McDowell and Herman proposed a capital raise (the "Capital Raise") through which the Company would issue up to $1.6 million in Class A shares at $0.39 per share to fund, among other things, the Company's payment of legal fees for the ACPDO Management employees who were arrested as a result of the AHCA investigation.[35] At the meeting, Plaintiff requested that the Board postpone the vote on the Capital Raise to provide additional time for the Board to review information regarding the proposal.[36] The Board proceeded with the vote over Plaintiff's objections, with McDowell and Herman voting in favor of, and Plaintiff and Dr. Cabrerizo voting against, the Capital Raise.[37]

Shortly after the meeting, Boyne and certain other investors held a special meeting of a majority of the Company's Class A stockholders to approve an

---

[34] JX 96.

[35] JX 97 at 2.

[36] *Id*.

[37] *Id*.

11

amendment to the Company's Certificate of Incorporation to permit the issuance of an additional 4,550,000 shares of Class A-1 Stock to facilitate the Capital Raise.[38]

Later that day, Plaintiff received a Purchase Right Notice advising that "[t]he board of directors of the Company determined that, in order to raise additional working capital, it was in the best interest of the Company to issue 4,102,564.10 Shares of Class A Stock . . . at a price per Class A share equal to $0.39," and that "[p]ursuant to the Bylaws and the Stockholders Agreement, the Company is offering to each Preemptive Rights Holder the right to participate in the Issuance by purchasing up to his, her, or its pro rata share of the New Securities."[39]

**F.     Plaintiff Files Suit In The Court Of Chancery To Enjoin The Capital Raise.**

On June 14, 2023, Plaintiff and Dr. Cabrerizo filed a complaint in this Court under the captioned *Mellado v. McDowell*, C.A. No. 2023-0620-SG (Del. Ch. June 14, 2023) (the "Delaware Plenary Action"), accompanied by a Motion for Expedited Proceedings and a Motion for Temporary Restraining Order seeking to temporarily enjoin the Capital Raise.

---

[38] JX 99 at 2.

[39] JX 100 at 1.

On June 30, 2023, Vice Chancellor Glasscock, to whom that action is assigned, held a hearing on the Motion for Temporary Restraining Order. At the conclusion of that hearing, the Court granted the motion in part, explaining:

> [T]here are many troubling aspects of this transaction, and that includes exclusion of the directors from the deliberative process, actions of the restructuring committee, [and] the purpose of payment of legal fees for employees of another entity, among the troubling aspects.
>
> But most of those are grist for a breach of fiduciary duty suit, if appropriate, for damages and need not be addressed in my decision here on temporary restraining order.
>
> The TRO request centers on informational rights. But also, I find, it raises questions of conversion and dilution inherent in the transaction. These allegations, I find colorable.
>
> The irreparable harm here is that the plaintiffs are presented with a Morton's fork—either invest without sufficient information and in the face of a resulting contractual waiver of rights to challenge the transaction; or forgo investment and be substantially diluted. That is irreparable harm, and I would cite to this Court's opinion in *Flight Operations*.
>
> The balance of the equities for a short restraint favors the plaintiffs, because the majority of the equity has been subscribed and the funds raised. A longer delay, however, would raise substantial concerns of irreparable harm to the entity itself.
>
> I grant the following limited temporary restraining order: The deadline for minority stockholders' election to participate is enjoined until July 14, 2023. No stockholder, during that time, shall oversubscribe. That restraining order is conditioned on the plaintiffs providing a definitive

list of information demanded by the end of business on July 3, 2023.[40] The Court further instructed that the temporary restraining order would be lifted on July 14, 2023 unless otherwise ordered by the Court, and that a second hearing on the Motion for Temporary Restraining Order would take place on that date to consider whether further relief would be necessary.[41]

As directed by the Court, on July 3, 2023, Plaintiff's counsel sent the Company's counsel a letter requesting fifteen categories of information concerning the Capital Raise.[42] On July 7, 2023, the Company's counsel produced documents responsive to certain of those requests and objected to others as overbroad.[43]

### G. Plaintiff Offers To Provide Information To AHCA.

On July 11, 2023, Plaintiff emailed an Investigator with the U.S. Department of Health and Human Services, attaching a letter that Plaintiff had written to the Medicaid Program Integrity Chief at AHCA (the "AHCA Letter").[44] In the AHCA Letter, Plaintiff claims that Boyne terminated him and Dr. Cabrerizo for refusing to

---

[40] *Mellado v. McDowell*, C.A. No. 2023-0620-SG, at 126-27 (Del. Ch. June 30, 2023) (TRANSCRIPT).

[41] *Id*. at 127.

[42] JX 112 at 1-2.

[43] JX 117 at 3.

[44] JX 118.

14

"allow [Boyne] to violate Florida statutes and operate a dental practice without the necessary supervision and licenses."[45] The AHCA Letter further asserts:

> Following the wrongful termination of our contracts, [ACPDO Management] falsely reported to us, through their lawyers at [McDermott, Will & Emery], that they had made all the necessary changes with an "appropriate designated transferee" and "submitted a number of updates and required notices to payers". However, we have since discovered that this is not true. They continued billing under Dr. Cabrerizo's personal NPI and dental license without her knowledge. In July 2022, we filed a lawsuit against them to regain control of the dental practices and for breaking the contracts with us.[46]

In the AHCA Letter, Plaintiff offered to provide AHCA with "evidence proving that [ACPDO Management] knowingly billed under Dr. Cabrerizo's credentials without her approval[,]" "written proof that [ACPDO Management] engaged in billing manipulation by adding behavioral codes and tampering with medical records[,]" "documented instances where the 466 law was violated in multiple ways[,]" and "evidence of false billing presentations by [ACPDO Management] and misrepresentation of dental law to favor [ACPDO Management]."[47] Plaintiff also "request[ed] an in-person meeting with [AHCA] to provide [it] with all the

---

[45] *Id*. at 1.

[46] *Id*.

[47] *Id*.

information we have gathered and to answer any questions that [AHCA] may have."[48]

### H. Plaintiff Requests Information Pursuant To The Company's Bylaws.

On July 12, 2023, Plaintiff's counsel emailed the Company's counsel concerning its document production in the Delaware Plenary Action, explaining that "[a]lthough we believe all the requested documents [identified in Plaintiff's July 3, 2023 letter] are relevant, my clients now request the same documents . . . as directors of the Company" pursuant to Section 6.2 of the Company's bylaws (the "Bylaws").[49] Section 6.2 of the Bylaws provides:

> Inspection. The books, accounts, and records of the Corporation shall be open to inspection by the members of the Board at all times, and open to inspection by the stockholders at such time, and subject to such regulations as the Board may prescribe, except as otherwise provided by the DGCL.[50]

The Company rejected that request on the grounds that it did not comply with 8 *Del. C*. § 220.

---

[48] *Id*. at 3.

[49] JX 122 at 1.

[50] JX 1 § 6.2.

On July 19, 2023, the Company's counsel certified to the Court in the Delaware Plenary Action that the Company had produced certain documents in response to Plaintiff's requests concerning the Capital Raise.[51]

## I.     Plaintiff Serves The Demand.

On July 21, 2023, Plaintiff served a demand on the Company pursuant to Section 6.2 of the Bylaws and 8 *Del. C.* § 220(d), seeking to inspect thirteen categories of books and records (the "Demand").[52]  The Demand states that Plaintiff seeks books and records "for the purpose of fulfilling his fiduciary duties as a director and to have the same information about the Company, its subsidiaries and the dental practices, provided to the other directors, Mr. McDowell and Mr. Herman."[53]

The thirteen categories of documents sought in the Demand include, "[f]or the period from January 2022 to the present":

1.     All minutes of the Company's Board meetings;

2.     All minutes of any of the Company's committee meetings;

3.     All materials prepared for or shared with any committee of the Company;

---

[51] JX 126 ¶ 4.

[52] JX 128 at 2-3.

[53] *Id*. at 2.

4. All documents and other materials provided to Mr. McDowell and Mr. Herman in their capacity as directors of the Company;

5. All communications between Mr. McDowell and Mr. Herman relating to their role and duties as directors of the Company including but not limited to the business and operations of the Company, its subsidiaries and the dental practices;

6. All financial records of the Company and its subsidiaries including the dental practices, including but not limited to bank accounts and balances;

7. All communications between the Company, or the Board and the Company's counsel McDermott Will & Emery, including but not limited to the business and operations of the Company, its subsidiaries and the dental practices;

8. All documents and communications concerning the hiring of any third-party to work on behalf of the Company, including but not limited to the lobbyist firm Capital City;

9. All communications between the Company, or the Board, or Mr. McDowell and Mr. Herman in their capacity as directors, and any shareholders relating to the business and operations of the Company, its subsidiaries and the dental practices;

10. All communications between the Company, or the Board, or Mr. McDowell and Mr. Herman in their capacity as directors, to any employee, officer, or director of the Company, its subsidiaries or the dental practices relating to their business and operations, including but not limited to Cristi Olson, Ryon Vazquez, Dr. Howard Fetner, Alex Villanueva, Matt Menker, and Leonel Revelo;

11. All communications between any third-party working on behalf of the Company and the Board or Company Counsel McDermott Will & Emery, including but not limited to the lobbyist firm Capital City;

18

12.    All communications and documents exchanged with AHCA regarding the AHCA Investigation, including those related to payment holds or transfer of patients to other dental providers; and

13.    All communications with insurers or [managed care organizations] regarding the subject matter covered by the AHCA Investigation, including any information relating to payment holds, or transfer of patients to other providers.[54]

## J.    The Board Forms A Special Litigation Committee.

On July 28, 2023, the Board held a meeting at which it formed a Special Litigation Committee, consisting of McDowell, Herman, and Haiz, "to take all such actions and make all decisions and determinations for and on behalf of the Company in relation to the [Florida Action and the Delaware Plenary Action], and any pending or threatened action, suit or proceeding relating to or arising out of any of the foregoing matters . . . ."[55]

That day, the Special Litigation Committee, through counsel, sent a letter to Plaintiff asserting that the Demand did "not comply with well-established Delaware law" because (1) the Demand was sent by an attorney rather than a director; (2) Plaintiff "is seeking documents to further his own self-interests and not the best interests of the Company"; (3) Plaintiff "is improperly using Section 220 to

---

[54] *Id*. at 2-3.

[55] JX 133 at 1; JX 135, Ex. A at 1.

circumvent the discovery process in both Delaware and Florida"; (4) the Demand "seek[s] communications well exceeding the scope of books and records of the Company under Delaware Law"; and (5) "the Demand improperly seeks privileged documents."[56]

The Company nevertheless agreed to provide Plaintiff with copies of all Board and committee meeting minutes and materials, as well as "[a]ll financial records of [the Company] and its subsidiaries including the dental practices," conditioned on Plaintiff's "entry into a confidentiality agreement satisfactory to the Company and an express undertaking that [Plaintiff] will not use the documents produced in any litigation or proceedings without prior written consent of the Company."[57]

### K.    Plaintiff Initiates This Action.

On August 2, 2023, Plaintiff filed a Verified Complaint for Books and Records Inspection pursuant to the Bylaws and 8 *Del. C.* § 220(d), seeking an order compelling the Company to produce the books and records sought in the Demand.[58]

Following an initial scheduling hearing, the Court set a one-day trial for November 14, 2023, and the parties engaged in discovery.  It did not go smoothly. On September 13, 2023, the Company filed a Motion to Compel Discovery from

---

[56] JX 137 at 1-3.

[57] *Id*. at 3.

[58] Dkt. 1.

Plaintiff.[59] On October 13, 2023, the Company filed a Motion to Vacate Trial Date,[60] and on October 17, 2023, the Company filed a Motion to Compel Search Terms.[61] On October 20, 2023, Plaintiff filed a Motion to Quash a subpoena served on Dr. Cabrerizo.[62] On October 23, 2023, Vice Chancellor Glasscock held a hearing on the pending motions, during which he denied the Motion to Vacate Trial Date, granted in part and denied in part the Motion to Compel Discovery and Motion to Compel Search Terms, and denied the Motion to Quash.[63]

On October 27, 2023, the Company filed a Motion for Protective Order, seeking to quash deposition notices served on non-party directors McDowell and Herman.[64] This action was reassigned to me on November 2, 2023.[65] On November 3, 2023, I granted the Motion for Protective Order in part, instructing that Plaintiff could not depose McDowell and Herman in their individual capacities but that

---

[59] Dkt. 22.

[60] Dkt. 31.

[61] Dkt. 34.

[62] Dkt. 37.

[63] Dkt. 59.

[64] Dkt. 44.

[65] Dkt. 54.

Plaintiff was permitted to take one Rule 30(b)(6) deposition, limited to two hours on the record, concerning three narrow topics.[66]

### L. The Company Moves For Adverse Inferences Based On Plaintiff's Refusal To Produce Discovery Concerning The AHCA Investigation.

Also on November 3, 2023, the Company filed a Motion for Inferences, to Show Cause, And/Or Compel Wrongfully Withheld Discovery (the "Motion for Inferences").[67] In that motion, the Company argues that Plaintiff improperly withheld documents and refused to answer questions at his deposition concerning his communications with AHCA, on the basis that AHCA has instructed Plaintiff not to disclose details about its investigation.[68] The Company contends Plaintiff had "no basis to withhold th[is] information" and that doing so "impeded [the Company's] ability to prepare for trial."[69] The Motion for Inferences seeks an order

---

[66] Dkt. 59.

[67] Dkt. 60. At a pre-trial conference held on November 8, 2023, six days before trial, I denied the Company's request to compel withheld discovery and took the Company's request for adverse inferences under advisement. Dkt. 69.

[68] For example, at his deposition and trial, Plaintiff refused to confirm or deny whether he (1) offered to, or did, provide records or nonpublic information about the Company to AHCA; (2) communicated with AHCA about the management of the Company; (3) is otherwise "helping with" an investigation of the Company, or was on the date he sent the Demand; or (4) told AHCA that he was trying to regain control of the Dental Practices. Pl. Dep. at 55-67.

[69] Dkt. 60 ¶¶ 16, 18.

providing that "[t]he facts regarding the AHCA Investigation and Plaintiff's actual purpose for his demand are taken as established for the purpose of this action."[70]

A one-day trial was held on November 14, 2023. The parties submitted post-trial briefs on November 20, 2023.[71]

## II. STANDARD OF REVIEW

### A. The Framework

Section 220(d) of the Delaware General Corporation Law provides that a "director shall have the right to examine the corporation's . . . books and records for a purpose reasonably related to the director's position as a director." 8 *Del. C.* § 220(d). "A director who has a proper purpose . . . has 'virtually unfettered' rights to inspect books and records." *Chammas v. Navlink, Inc.*, 2016 WL 767714, at *6 (Del. Ch. Feb. 1, 2016) (citation omitted). "Such 'unfettered' rights imply a right of access at least equal to that of the remainder of the board." *Id.* "The public policy underlying that rule is plain: a director charged with fiduciary obligations to protect and preserve a corporation must have access to the corporation's books and records if he reasonably can be expected to perform his duties." *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *8 (Del. Ch. Aug. 30, 2016).

---

[70] *Id.* ¶ 16; *see also* [Proposed] Order Granting Def.'s Mot. For Inferences, To Show Cause, And/Or To Compel Wrongfully Withheld Discovery ¶ 2.

[71] Dkts. 86-87.

"A 'director seeking inspection of books and records makes out a *prima facie* case when he shows that he is a director, he has demanded inspection and his demand has been refused." *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *8 (Del. Ch. Jan. 15, 2019), *abrogated in part on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019) (citation omitted). The defendant corporation then bears the burden to prove by a preponderance of the evidence "that any such inspection is for an improper purpose." *Id*. (citation and internal quotation marks omitted).[72]

### B. Plaintiff Will Bear The Burden Of Proof On Proper Purpose.

Discovery issues in this action have somewhat complicated the straightforward framework summarized above.

Plaintiff has made a *prima facie* case for inspection by showing that he is a current director of the Company; he made the Demand for books and records; and the Demand was, at least partially, refused. So, under normal circumstances, the Company should bear the burden of proving by a preponderance of the evidence that Plaintiff's purpose is improper.

Here, however, through its Motion for Inferences, the Company contends that "Plaintiff wrongfully prevented 'full and fair discovery' into the reasons for his

---

[72] *See also* 8 *Del. C*. § 220(d) ("The burden of proof shall be upon the corporation to establish that the inspection such director seeks is for an improper purpose.").

Demand" by withholding documents and refusing to answer questions about AHCA, on the grounds that AHCA purportedly instructed him not to reveal information concerning its pending investigation.[73] The Company seeks sanctions in the form of adverse inferences to remedy what it characterizes as discovery abuse.

"When a party objects to providing discovery, '[t]he burden . . . is on the objecting party to show why and in what way the information requested is privileged or otherwise improperly requested.'" *Van de Walle v. Unimation, Inc.*, 1984 WL 8270, at *2 (Del. Ch. Oct. 15, 1984). To be clear, Plaintiff has not invoked privilege or identified any particular immunity, defense, or other legal doctrine to justify his refusal to produce discovery relevant to the Company's defenses.[74] Rather, Plaintiff simply claims that he has been instructed not to disclose information concerning AHCA's ongoing investigation and that he believes he may suffer adverse consequences if he does not comply. Notably, Plaintiff has refused to identify who

---

[73] Dkt. 60 ¶ 16.

[74] *See* Pl. Dep. at 40:21-41:16 ("[M]y client was interviewed by the State of Florida in connection with an ongoing civil and criminal investigation. And . . . that agency and those that conducted the interview made it clear that we were not to disclose the contents of those communications until further instructed. . . . I'm only relaying information, I wasn't in those meetings, whether that's a statutory obligation or some other obligation but we're going to respect that. . . . I'm instructing him not to answer, you can draw your own conclusions. I've given you my thought process."); *id.* at 241:2-8 ("We did not assert a privilege. We asserted the fact that AHCA has instructed the Witness not to disclose the substance of the meetings and interviews that he's had as part of the criminal and civil investigation.").

provided that instruction to him, when the instruction was made, or the precise parameters of the instruction.[75] If AHCA's instruction was made in writing, Plaintiff has not produced it—the only evidence of such an instruction is Plaintiff's self-serving testimony.[76] Likewise, assuming the instruction is real, there is no evidence that Plaintiff ever sought permission or clarification from AHCA to confirm what he might be permitted to disclose in this litigation.

Most troubling, Plaintiff represented to the Court that the Company's objections were overblown because Plaintiff "turned over all his documents/e-mails to his counsel," and "there simply were no responsive communications with AHCA."[77] Those statements were disproven at trial, when the Company produced the AHCA Letter from its own records—undermining Plaintiff's credibility and raising questions of potential spoliation.[78]

Under these circumstances, some remedy is needed to address Plaintiff's refusal to provide relevant discovery concerning AHCA. The Company urges that Plaintiff "should be precluded from 'offering selective and self-serving evidence'

---

[75] Pl. Dep. at 70:8-71:4; 248:6-11.

[76] *Id*. at 55:2-8.

[77] Dkt. 62 ¶ 23. The Company's failure to produce the AHCA Letter from its own files by the discovery deadline is likewise concerning, but does not, as Plaintiff argues, constitute "unclean hands." Pl.'s Post-Trial Br. at 28-31, Dkt. 87.

[78] Tr. at 147-162.

about [his] reasons" for making the Demand, and seeks an order deeming that "[t]he facts regarding the AHCA Investigation and Plaintiff's actual purpose for his demand are taken as established for the purpose of this action."[79] This request is, to my mind, too extreme. The adverse inferences the Company seeks effectively amount to a default judgment that Plaintiff is not entitled to inspection.[80] A default judgment is the "ultimate sanction for contempt," "must be used sparingly," and "should be granted [only] if no other sanction would be more appropriate under the circumstances." *DG BF, LLC v. Ray*, 2021 WL 5436868, at *5 (Del. Ch. Nov. 19, 2021), *aff'd*, 294 A.3d 63 (Del. 2023) (citation and internal quotation marks omitted).

In my view, imposing a more moderate remedy by shifting the burden of proof to Plaintiff is the fairest way to address the Company's inability to seek full discovery into Plaintiff's communications with AHCA.[81] *See Zutrau v. Jansing*,

---

[79] Dkt. 60 ¶ 16; *see also* [Proposed] Order Granting Def.'s Mot. For Inferences, To Show Cause, And/Or To Compel Wrongfully Withheld Discovery ¶ 2.

[80] *See* Def.'s Post Trial Br. at 7, Dkt. 86 (acknowledging that the adverse inferences sought would be "outcome-dispositive").

[81] The Court has broad discretion to fashion an appropriate remedy, whether it looks to authorities addressing discovery abuse or, by analogy, a witness's refusal to answer questions based on the Constitutional Fifth Amendment right against self-incrimination. *See Genger v. TR Invs., LLC*, 26 A.3d 180, 190 (Del. 2011) ("A trial court has broad discretion to fashion and impose discovery sanctions."); *see also Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1194 n.8 (Del. 2015) (citing the "prevailing rule that

27

2014 WL 3772859, at *30 (Del. Ch. July 31, 2014) (concluding that shifting the burden of proof to non-producing party on certain issues was "an appropriate equitable sanction for [the party's] failure to comply with his discovery obligations"), *aff'd*, 123 A.3d 938 (Del. 2015), *and aff'd*, 123 A.3d 938 (Del.);[82] *see also Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *11 (Del. Ch. Dec. 4, 2018) ("A more moderate but still significant discovery sanction is to alter the burden of proof on a particular issue, either by shifting it to the party that failed to comply with its discovery obligations or by increasing or decreasing the relevant standard." (citation and internal quotation marks omitted)); *James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *9 (Del. Ch. Dec.

---

the Fifth Amendment *does not forbid* adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment '*does not preclude* the inference where the privilege is claimed by a party to a Civil cause'") (citation omitted) (emphasis added); *State v. Da Zhong Wang*, 2018 WL 2202274, at *4 (Del. Super. Ct. May 11, 2018) ("'[R]eliance on the Fifth Amendment in civil cases *may* give rise to an adverse inference against the party claiming its benefits.") (citation omitted) (emphasis added).

[82] In *Zutrau*, the plaintiff served the defendant with discovery requests, the defendant objected "on the grounds that [such requests] were unduly burdensome, duplicative, and unnecessary," and the plaintiff moved to compel. *Zutrau*, 2014 WL 3772859, at *29. As here, the Court heard the motion in conjunction with the pre-trial conference less than one week before trial. "Due to the limited time remaining before trial," the Court took the motion under advisement and granted the plaintiff leave to pursue burden shifting arguments. *Id*. Post-trial, the Court held that shifting the burden of proof to the defendant, solely with respect to arguments for which documents were not produced, was "an appropriate equitable sanction for [the defendant's] failure to comply with his discovery obligations." *Id*. at *29-30.

5, 2014) (same).  Because the Company was denied full discovery into its proper purpose defense, the burden should shift to Plaintiff to prove by a preponderance of the evidence that his primary purpose for making the Demand is not improper.

Accordingly, solely with respect to the issue of Plaintiff's proper purpose, I shift the burden of proof from the Company to Plaintiff.

## III.  ANALYSIS

The Company has raised three arguments to resist the Demand.  First, the Company asserts that the Demand is barred by laches.[83]  Next, the Company contends that Plaintiff's stated purpose for making the Demand—to access information about the Company to fulfill his fiduciary duties as a director—is a pretext for other improper purposes.[84]  As explained above, Plaintiff will bear the burden of proof on that issue.  And finally, the Company argues that if Plaintiff is entitled to some inspection, then the Demand, which primarily seeks informal director and officer communications, is overbroad.[85]

I address each of these arguments in turn, below.

---

[83] DOB at 25.

[84] *Id*. at 28.

[85] *Id*. at 37.

## A. The Demand Is Not Barred By Laches.

As an initial matter, the Company contends that the Demand is barred by laches. The Company explains that although Plaintiff "claims [to] need[] documents to 'fulfill his fiduciary duties as a director,'" Plaintiff admits he "'ha[s] not been involved in the decisions of the Company, ha[s] not been invited to attend meetings of the Board . . . and ha[s] not received documents and communications relating to the business and affairs of the Company' since 'at least the spring of 2022.'"[86]

"The equitable defense of laches is based on the theory that upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief." *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978). "Laches consists of two elements: (i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant." *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1194 (Del. Ch. 2022) (citation and internal quotation marks omitted).

---

[86] *Id.* at 25.

The Company has not met its burden to demonstrate that Plaintiff unreasonably delayed in seeking books and records.[87] To the contrary, Plaintiff made his Demand less than two months after learning that he and Dr. Cabrerizo had been excluded from Board meetings, including the April 19, 2023 meeting at which the Restructuring Committee was formed. The Company also has not identified any prejudice resulting from Plaintiff's purported delay in seeking to enforce his inspection rights. The Company therefore cannot invoke the equitable defense of laches to avoid responding to the Demand.

**B. Plaintiff Has Established A Proper Purpose For Making The Demand.**

A director is entitled to books and records for a purpose reasonably related to his position as a director. If a director's true purposes for seeking books and records do not relate to his position as a director, and instead "are improper, or . . . in derogation to the interest of the corporation, then his right to inspect [books and records] ceases to exist." *Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993) (citation omitted).

---

[87] Because the Company has not proven the elements of a laches defense, I need not consider whether such a defense is appropriately raised in a statutory books and records action, particularly one where the plaintiff is a director who owes ongoing fiduciary duties to the Company. *But see Everett v. Hollywood Park, Inc.*, 1996 WL 32171, at *4 n.2 (Del. Ch. Jan. 19, 1996) (noting the defendant "failed to establish that its defense of laches is a valid defense in a § 220 statutory action").

Where the director has a proper purpose for inspection, "any other motive or improper secondary purpose is irrelevant." *Id.* at *4. "[I]f [a director] ha[s] some proper and some improper purposes, he still ha[s] a right to inspect [the corporation's] books and records" because "'access to corporate books and records is fundamentally important to the performance of the director's fiduciary duties . . . .'" *Carlson v. Hallinan*, 925 A.2d 506, 545 n.267 (Del. Ch. 2006) (ellipses in original) (citations omitted). "[T]he mere prospect of harm to a corporate defendant," including the possibility that the director will "make information available to persons hostile to the Corporation or otherwise not entitled to it," will not foreclose inspection altogether. *Obeid v. Gemini Real Est. Advisors, LLC*, 2018 WL 2714784, at *3 (Del. Ch. June 5, 2018), *aff'd*, 202 A.3d 1124 (Del. 2019) (alteration in original) (citation omitted); *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 129 (Del. Ch. 1969).

Below, I reject Plaintiff's argument that the Company's Bylaws permit inspection for an improper purpose, but find that Plaintiff has met his burden to prove that his actual, primary purpose for making the Demand is reasonably related to his position as a director.

### 1. The Bylaws Do Not Authorize Inspection For An Improper Purpose.

Plaintiff contends that the Court may avoid the question of proper purpose by compelling inspection under the Bylaws, which provide that "[t]he books, accounts,

and records of the Corporation shall be open to inspection by the members of the Board at all times . . . except as otherwise required by the DGCL."[88] According to Plaintiff, directors' inspection rights under the Bylaws are "even broader" than those afforded under Section 220(d) because "a proper purpose is not required" under the Bylaws.[89]

Plaintiff's position that the Bylaws afford the Company's directors inspection rights for an improper purpose is unconvincing. First, Section 220(d) "otherwise require[s]" a director seeking inspection to have "a purpose reasonably related to the director's position as a director." 8 *Del. C.* § 220(d). Second, as this Court has explained,

> The right of a director to examine corporate records springs from his duty to protect and preserve the corporation. He is a representative at all of the stockholders. Because of his fiduciary relationship to the corporation, he must maintain a high standard of loyalty to the corporation, but when he acts hostile to the corporate interests, when his motives are improper, then it must be said that he no longer is performing his corporate duties. Once he ceases to perform his corporate duties, his right to inspect the books of the corporation should immediately end. It seems entirely inconsistent to say that a director has an absolute right to inspect the records of a corporation so that he may better perform his obligations to protect the corporation, and in the next breath say this right is absolute and remains inviolate even though such examination is conducted for an improper purpose hostile to the interest of the corporation.

---

[88] JX 1 § 6.2.

[89] POB at 25; *see also id*. at 28 ("Section 6.2 of ACPDO Parent's Bylaws do not require a proper purpose for a director making a demand for corporate records.").

*State ex rel. Farber v. Seiberling Rubber Co.*, 168 A.2d 310, 312 (Del. Super. Ct. 1961). A fiduciary who owes duties of loyalty and care to the corporation cannot obtain books and records for an improper purpose unrelated to his role as a fiduciary.

### 2. Plaintiff's Purpose Is His Own.

The Company contends that Plaintiff's actual purpose in making the Demand is not his own, but his counsel's. To support this argument, the Company points to testimony from Plaintiff's deposition during which he "either deferred to his counsel or declined to answer on privilege grounds for many basic questions about his Demand."[90] Citing *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553 (Del. Ch. Nov. 13, 2017), the Company asserts that Plaintiff's "deference to his counsel when asked to explain basic issues about *his Demand* suggests that counsel's—not [Plaintiff]'s—purposes are being pursued with the Demand and this litigation."[91]

This case bears no resemblance to *Wilkinson*, in which "the trial record established that the purposes for the inspection belonged to" counsel and the plaintiff had "simply lent his name to a lawyer-driven effort by entrepreneurial plaintiffs' counsel." *Wilkinson*, 2017 WL 5289553, at \*2. It is more like *Schnatter*, in which Chancellor Bouchard rejected the argument that a director-plaintiff's "purpose [wa]s

---

[90] DOB at 35.

[91] *Id*. at 36-37 (emphasis in original).

improper because he 'had no idea' why he [wa]s seeking many of the documents requested in the Demand." *Schnatter*, 2019 WL 194634, at *13. Here, as in *Schnatter*, "a director of a corporation . . . made an inspection demand in response to a specific sequence of events," and nothing in the record "support[s] the conclusion that [Plaintiff] was so disengaged from the process that the actual purpose for the Demand was to benefit his counsel." *Id.* at *14. Without a doubt, this litigation is driven by the principals and not the lawyers involved.[92]

### 3. Plaintiff's Stated Purpose For Seeking Books And Records— To Fulfill His Fiduciary Duties As A Director—Is Sincere.

Plaintiff purports to seek books and records to fulfill his fiduciary duties as a director of the Company. The Company contends Plaintiff's stated purpose for seeking books and records is pretextual, and that his real "purpose is regaining control of the Dental Practices—which is not reasonably related to his position as a director."[93]

Based on the evidence presented at trial, I find that Plaintiff has met his burden to prove by a preponderance of the evidence that his stated purpose for seeking books

---

[92] In its Motion for Inferences, the Company identifies instances in which Plaintiff refused to answer questions about the Demand on the basis of attorney-client privilege. I decline to draw any negative inferences therefrom. *See* D.R.E. 512(a) ("The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.").

[93] DOB at 30.

and records—to fulfill his fiduciary duties as a director—is not pretextual, but sincere.

At trial, Plaintiff credibly testified that he made the Demand for books and records so that he can make informed decisions as a director.[94]  Prior to the spring of 2022, Plaintiff and Dr. Cabrerizo were actively involved in the business.  Since their terminations, however, they have received limited information about the Company, notwithstanding the potentially devastating financial consequences of AHCA's investigation.  Six weeks before making the Demand, Plaintiff learned for the first time that, without notice to Plaintiff or Dr. Cabrerizo, Boyne's director designees had formed a Restructuring Committee, consisting of themselves, to consider alternatives for addressing the Company's liquidity crisis.  Plaintiff was blindsided by the Restructuring Committee's proposal to undertake a Capital Raise, and steamrolled when Boyne's director designees decided to push forward with that transaction despite Plaintiff's objections that he was not given sufficient time or information to consider the proposal and other alternatives.  While the Company— prompted by an injunction in the Delaware Plenary Action—eventually responded to Plaintiff's requests for information about the Capital Raise, Plaintiff credibly

---

[94] Tr. at 63:2-64:9; 65:19-20; 204:22-205:1; 207:7-24; 216:5-9; 217:15-19; 222:8-13; 229:17-21; 231:2-4; 270:11-14.

testified that he made the Demand to gain broader insight into the Company, consistent with his fiduciary duties as a director:

> Let's say I have been seeing this patient that is super healthy, and he is in great shape, and all of a sudden this senior dentist tells me, you know, You're not seeing this patient anymore; I'm going to take care of it. They remove me from the care, and a year later or so this patient comes dying, the mouth is in really bad shape, suspicious of [what] could be terminal cancer, and this dentist tells me, you know what? The only thing I want you to do is do this one area here and don't see the rest of it. Well, that is not the responsible thing to do. And I'm trying to put the analogy, being a board director and my fiduciary duty with the company. So I have to run all these tests and basically get[] all this information to see—I might not need them all, but I might need them. I don't know until I see them. And maybe when I see these categories, I might need even more information in order to be able to make an intelligent decision as a fiduciary. With that patient, for example, depending what he has, I have to run different tests in order to see what would be the best course of treatment to favor the health of that patient; in this case to help the health of the company.[95]

I therefore find that Plaintiff does, in fact, seek books and records to satisfy his fiduciary duties as a director of the Company.

---

[95] *Id*. at 63:2-64:9 (internal quotation marks omitted); *see also id.* at 65:3-15 ("[W]e have to see the current health of one of the subsidiaries there, one of the practices, if they are still viable, if they need to go to bankruptcy, if they can continue operating, if these governmental agencies are going to allow them to practice continuously, if the insurance companies that they have canceled them already, and actually they have had damage already by transferring thousands of patients to the competition, if at least they will allow them to come back and try to recapture or bring new patients. There are many questions that I cannot give you the answer right now because I don't have information.").

### 4. Plaintiff Also Seeks Books And Records To Provide To AHCA And To Further His Other Litigations.

The Company contends that Plaintiff's actual purpose for seeking books and records is to regain control of the Dental Practices by assisting AHCA in its investigation of the Company and advancing the Florida Action.

At trial, Plaintiff testified that, although he and Dr. Cabrerizo initially filed the Florida Action to regain control of the Dental Practices, they no longer wish to do so. He claims:

> [W]hen they fire[d] Ania and they did the arrests in April of 2023, if we would have been able to get the opportunity of being able to control the practices at that moment . . . we might have been able to salvage the company at that moment. Now, seeing time has gone by and the company has—with the last numbers that I got, I feel that they run the company to the ground, and more litigation have occurred, and more investigations have occurred, I'm not sure that the practices at this moment are salvageable or the liabilities that they have will be—that the company with the government will be able to mitigate that at this point.[96]

Dr. Cabrerizo similarly testified that she "tried to regain control on May the 18th[, 2022, but] ha[s]n't tried to regain control again of the dental practices" since then.[97]

I am not convinced by Plaintiff's and Dr. Cabrerizo's self-serving testimony that they no longer wish to regain control of the Dental Practices. But even if they

---

[96] *Id*. at 267:22-268-14; *see also id*. at 182:4-8 ("I was trying to get control of the practice *at the given moment* . . . but my intention *at that time* was to try to get control of the practices." (emphasis added)).

[97] *Id*. at 299:17-300:5.

do not, the evidence shows, and I find, that Plaintiff's purposes for seeking books and records include gathering information to provide to AHCA in its ongoing investigation of the Company. The most direct evidence of that purpose is the AHCA Letter—which Plaintiff failed to produce in discovery—offering to provide AHCA with "evidence proving that [ACPDO Management] knowingly billed under Dr. Cabrerizo's credentials without her approval," "written proof that [ACPDO Management] engaged in billing manipulation by adding behavioral codes and tampering with medical records," "documented instances where the 466 law was violated in multiple ways," and "evidence of false billing presentations by [ACPDO Management] and misrepresentation of dental law to favor [ACPDO Management]," and "request[ing] an in-person meeting with [AHCA] to provide [it] with all the information we have gathered and to answer any questions that [AHAC] may have."[98] Notably, Plaintiff forwarded the AHCA Letter to an Investigator with the U.S. Department of Health and Human Services just days before making the Demand.

At his deposition and trial, Plaintiff denied sending the Demand to gather more information to assist AHCA with its ongoing investigation.[99] He testified that

---

[98] JX 118 at 2.

[99] Tr. at 97:11-16.

39

he does not intend to share information produced in response to the Demand with AHCA, and that he would agree to refrain from doing so absent a court order.[100] Despite that testimony, I am convinced, on the record before me, that at the time Plaintiff made the Demand, he intended to provide information to AHCA to assist in its investigation.

The Company also contends that Dr. Cabrerizo admitted at her deposition that Plaintiff's purpose for the Demand is to regain control of the Dental Practices by advancing the Florida Action. This argument does not accurately characterize Dr. Cabrerizo's testimony.[101] Nevertheless, it is apparent that the sweeping requests for director and officer communications in the Demand would, in fact, further Plaintiff's litigation efforts.

### 5. Plaintiff's Primary Purpose For Making The Demand Is Proper.

To summarize, based on the evidence presented at trial, I find that Plaintiff's purposes for making the Demand include obtaining information about the Company to satisfy his fiduciary duties, assisting AHCA in its ongoing investigation, and, to a lesser degree, advancing Plaintiff's other litigations.

---

[100] *Id*. at 97:17-20.

[101] *See id*. at 299:2-5 ("I tried to regain control on May the 18th and haven't tried to regain control again of the dental practice. And that is the reason why my husband is asking for the books and records.").

Where a stockholder has multiple purposes for inspection, "the critical inquiry is whether the stockholder related purpose predominates over the ulterior purpose." *Helmsman Mgmt. Srvs., Inc. v. A & S Consultants, Inc*., 525 A.2d 160, 167 (Del. Ch. 1987). If the ulterior purpose predominates, inspection is denied. For directors, it is less clear that competing purposes must be ranked as "primary" and "secondary." Some cases suggest a director's *primary* purpose for the Demand must be reasonably related to her status a director;[102] others suggest *any* showing of a proper purpose is sufficient to support some inspection, given the "fundamental importance" of "[t]he rights of directors to access the corporate books and records." *Holdgreiwe*, 1993 WL 144604, at *3; *Henshaw*, 252 A.2d at 128.[103]

---

[102] *See Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 199 (Del. Ch. 2023) ("[A] director cannot use Section 220(d) if the corporation proves that the *primary* purpose for the inspection is unrelated to the director's duties." (emphasis added)); *Holdgreiewe*, 1993 WL 144604, at *3 ("[T]he sole issue remaining to be resolved is the question whether [the corporation] has succeeded in bearing its burden of showing that [the plaintiff's] *primary* purpose for seeking this inspection is improper, *i.e.*, any purpose not related to his position as a director." (emphasis added)).

[103] *See Chammas*, 2016 WL 767714, at *6 ("[A] director's proper purpose does not become improper 'because of the possibility that he may abuse his position as a director and make information available to persons hostile to the Corporation or otherwise not entitled to it." (alteration in original) (citation omitted)); *Carlson*, 925 A.2d 546 n.267 ("Even if [plaintiff] had some proper and some improper purposes, he still had a right to inspect [the corporation's] books and records. . . . This proposition applies with even greater force in the context of a director seeking books and records because 'access to corporate books and records is fundamentally important to the performance of the director's fiduciary duties . . . .'" (ellipses in original) (citation omitted)); *Henshaw*, 252 A.2d at 129 ("In other words, [plaintiff] showed a purpose germane to his position as a director and that entitles him to

In any event, to the extent I must decide which of Plaintiff's purposes predominates, I find, weighing the entire record before me,[104] that Plaintiff has met his burden to prove by a preponderance of the evidence that his primary purpose for making the Demand is to satisfy his fiduciary duties as a director of the Company, and that his other purposes are secondary to that purpose.

## C.    Scope

Because Plaintiff has established a right to inspection, I turn to the scope of the Demand.

In assessing the scope of Plaintiff's requests, I begin with the proposition that a director's "access to [the corporation's] records must necessarily be broad and unrestricted." *Schnatter*, 2019 WL 194634, at *14 (alteration in original) (citation and internal quotation marks omitted). "A director who has a proper purpose . . . has 'virtually unfettered' rights to inspect books and records," which "imply a right of access at least equal to that of the remainder of the board." *Chammas*, 2016 WL 767714, at *6 (citations and footnote omitted). "Management cannot 'pick and choose' the specific information each director receives." *Id*. (citation omitted). And

---

an examination of the books and records. His purpose is not improper because of the possibility that he may abuse his position as a director and make information available to persons hostile to the Corporation or otherwise not entitled to it.").

[104] *See Helmsman Mgmt. Servs., Inc.*, 525 A.2d at 166 ("The issue of whether a concept so elusive as purpose or motive is 'primary' or 'secondary', involves a judgment that necessarily is qualitative, not mathematical.").

yet, a director "must direct the Court to specific books and records related to the [director's] proper purpose" because "[w]ithout such direction, the Court is unable to direct production of an appropriate set of documents, and unwilling to burden the corporation to search for the same." *Id.* at *8 n.98 (citation omitted).

Additionally, although Plaintiff has established his right to inspect books and records for a purpose reasonably related to his position as a director, his secondary purposes for making the Demand are not irrelevant—"secondary purposes and ulterior motives can serve as a basis for circumscribing" the scope of a demand. *Safecard Servs., Inc v. Credit Card Serv. Corp*, 1984 WL 8265, at *2 (Del. Ch. Sept. 5, 1984); *see also Helmsman*, 525 A.2d at 167 ("Plaintiff's ulterior purpose will be . . . taken into account in determining the scope of the relief to which [Plaintiff] would be entitled.").

The Demand requests documents responsive to thirteen categories of documents, some broader than others. The Company contends that it has already produced some documents in response to Request Nos. 1 through 3 and 6, which seek:

1.   All minutes of the Company's Board meetings;

2.   All minutes of any of the Company's committee meetings;

3.   All materials prepared for or shared with any committee of the Company; [and]

43

6.     All financial records of the Company and its subsidiaries including the dental practices, including but not limited to bank accounts and balances . . . .[105]

To the extent additional documents responsive to these requests exist, they must be produced.

Request No. 4 seeks "[a]ll documents and other materials provided to Mr. McDowell and Mr. Herman in their capacity as directors of the Company."[106] In theory, Plaintiff is entitled to the same documents that have been provided to McDowell and Herman "in their capacity as directors"—but, given McDowell's and Herman's roles as officers of the Company, there is no clear delineation between documents they receive as directors versus officers. One category of documents identified at trial that must be produced includes agendas, minutes, and materials[107] from the Company's and its subsidiaries' monthly Operations ("Ops") meetings, which McDowell and Herman attend in their capacities as directors of the Company.[108]

The remainder of Plaintiff's requests seek informal "communications," including director and officer email. Some of these requests, including Request Nos.

---

[105] JX 128 at 2.

[106] *Id.*

[107] This should include all materials provided to any attendees of the Ops meetings.

[108] *See, e.g.*, JX 40; JX 50; JX 57. *See also* Tr. at 14:17-21; 20:13-22:21; 23:1-24:9.

5, 7, and 9 through 11, seek communications without limitation to any particular subject matter beyond the "business and operations of the Company":

5.  All communications between Mr. McDowell and Mr. Herman relating to their role and duties as directors of the Company including but not limited to the business and operations of the Company, its subsidiaries and the dental practices;

7.  All communications between the Company, or the Board and the Company's counsel McDermott Will & Emery, including but not limited to the business and operations of the Company, its subsidiaries and the dental practices;

9.  All communications between the Company, or the Board, or Mr. McDowell and Mr. Herman in their capacity as directors, and any shareholders relating to the business and operations of the Company, its subsidiaries and the dental practices;

10. All communications between the Company, or the Board, or Mr. McDowell and Mr. Herman in their capacity as directors, to any employee, officer, or director of the Company, its subsidiaries or the dental practices relating to their business and operations, including but not limited to Cristi Olson, Ryon Vazquez, Dr. Howard Fetner, Alex Villanueva, Matt Menker, and Leonel Revelo [and]

11. All communications between any third-party working on behalf of the Company and the Board or Company Counsel McDermott Will & Emery, including but not limited to the lobbyist firm Capital City . . . .[109]

Essentially, Plaintiff seeks every single communication between McDowell and Herman concerning the Company over a nearly two-year period. These requests

_____

[109] JX 128 at 2-3.

45

should be denied because they fail to "direct the Court to specific books and records related to the [Plaintiff's] proper purpose,"[110] and because these broad, discovery-like requests appear more geared toward fishing for documents in aid of the AHCA investigation and Plaintiff's other litigations than seeking specific information needed for Plaintiff to fulfill his fiduciary duties.

The remaining requests, Request Nos. 8 and 11 through 13, seek communications that are limited by subject matter:

> 8. All documents and communications concerning the hiring of any third-party to work on behalf of the Company, including but not limited to the lobbyist firm Capital City;
>
> 12. All communications and documents exchanged with AHCA regarding the AHCA Investigation, including those related to payment holds or transfer of patients to other dental providers; and
>
> 13. All communications with insurers or [managed care organizations] regarding the subject matter covered by the AHCA Investigation, including any information relating to payment holds, or transfer of patients to other providers.[111]

---

[110] *Chammas*, 2016 WL 767714, at \*6; *see also Schnatter*, 2019 WL 194634, at \*15 (finding requests "overbroad relative to the [director's] requested purpose"); *Gunther v. 5i Scis., Inc.*, C.A. No. 5800-CC, at 3-4 (Del. Ch. Nov. 23, 2010) (TRANSCRIPT) (denying books and records inspection because the scope of documents sought was "excessive," explaining that the request was "so over the top, beyond the scope of what would be reasonable, that had it been carved back into a more reasonable form, I might have come out differently," but cautioning that the Company should not interpret the denial as "blanket permission to withhold information from [the plaintiff] going forward because he remains a director on the board, and he's entitled to be informed in order to make informed decisions as a board member").

[111] JX 128 at 2-3.

46

These requests are narrowed by topic, but still raise red flags in light of Plaintiff's desire to assist AHCA in its ongoing investigation and to further his other ongoing litigation efforts. The Company should not be required to make a comprehensive, discovery-style email production in response to Requests 8, 12, and 13.[112]

### D.    Confidentiality

The Company asks that the Court "condition any production of documents upon entry into a mutually agreeable confidentiality agreement and an express undertaking that [Plaintiff] will not use the documents produced in any litigation or proceedings—including regulatory investigation, 'meetings,' or any related correspondence—without prior written consent of the Company."[113]  Plaintiff has repeatedly expressed his willingness to enter into a confidentiality agreement.[114]

---

[112] Alternatively, the Company argues that Plaintiff is not entitled to informal communications because such documents do not affect the corporation's "rights, duties, and obligations," and therefore do not "constitute books and records of the corporation." DOB at 42 (citing *Chammas*, 2016 WL 767714). *But see KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 756 (Del. 2019); *Bruckel v. TAUC Hldgs., LLC*, 2023 WL 116483, at *3 (Del. Ch. Jan. 6, 2023) (finding the manager of a limited liability company, who possessed information rights that parallel those of a director, "made a proper showing" that he was entitled to informal materials by showing that the company "informally conducted or conducts corporate business," explaining that "[i]f the managers conduct business only formally, those formal documents constitute the books and records that should be produced," but "[i]f the managers conduct business informally, those informal documents are books and records, and a manager is entitled to them").  Because I limit the scope of the Demand on other grounds, I do not reach these arguments.

[113] DOB at 52.

[114] Tr. at 65:24-66:3; 97:21;117:11-18; 174:5-8; 175:17-22; 205:5-9; 215:16-216: 9.

47

The parties should meet and confer regarding an appropriate confidentiality order within five days of this final report becoming an order of the Court.

### E.    Attorney-Client Privilege

In briefing, the parties debate whether Plaintiff is entitled to documents reflecting the legal advice of the Company's outside counsel, McDermott Will & Emery. If my recommendations regarding the scope of the Demand are adopted, it is unclear whether any privilege issues remain—and I am hesitant to provide general (perhaps advisory) guidance on privilege that could have broader implications in the Florida Action and the Delaware Plenary Action. Instead, consistent with the recommendations herein, the Company should produce privilege and redaction logs identifying any documents or information withheld or redacted on the basis of attorney-client privilege, so that Plaintiff may assert specific challenges to any such designations.

### F.    Fee-Shifting

Both Plaintiff and the Company request that the Court shift all of the attorneys' fees incurred in this litigation onto his or its opponent. Neither party is precluded from filing a motion for fees within thirty days of this final report becoming an order of the Court. However, if the parties so move, they are directed to meet and confer on a briefing schedule that contemplates seriatim (not simultaneous) submissions, even if each party files a separate motion.

## IV.    CONCLUSION

I recommend that judgment be entered for Plaintiff as set forth above. The parties should meet and confer regarding a form of implementing order within five days of this final report becoming an order of the Court. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2), within three business days.[115] Any prior stay of exceptions is hereby lifted.

---

[115] *See* Ct. Ch. R. 144(d)(2) ("In actions that are summary in nature or in which the Court has ordered expedited proceedings, any party taking exception shall file a notice of exceptions within three days of the date of the report.").